Erich BOHRMANN, Andrew Daniels, Jeffrey Gagnon, Nevena Novkovic, and Eric Ortman, Plaintiffs,

v.

MAINE YANKEE ATOMIC POWER COMPANY, Defendant.

Civil No. 95–359–P–C.

United States District Court, D. Maine.

May 1, 1996.

Jeffrey A. Thaler, Berman & Simmons, P.A., Lewiston, Maine, for Plaintiffs.

William J. Kayatta, Jr., Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Maine, for Defendant.

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

GENE CARTER, Chief Judge.

Plaintiffs, several University of Southern Maine students, have filed the present action against Maine Yankee Atomic Power Company ("Maine Yankee") for injuries they allegedly sustained after being exposed to radiation when touring Defendant's nuclear power plant in Wiscasset, Maine. Plaintiffs seek recovery pursuant to theories of common law negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, strict liability, fraud, battery, failure to meet State safety reporting requirements pursuant to 35–A M.R.S.A. § 4334(1)(A), and federal public liability pursuant to the Atomic Energy Act. This matter comes before the Court on Defendant's Motion to Dismiss (Docket No. 4).

### I. ALLEGED FACTS

The facts alleged in the Complaint are as follows. Plaintiffs are five University of Southern Maine students who were among a group of chemistry students invited to tour Defendant's facility. Complaint and Demand for Jury Trial (Docket No. 1) ¶¶ 12, 13. Plaintiffs allege that approximately two weeks before their tour, there was a radioactive gas leak in Defendant's primary auxiliary building (PAB) as a result of design flaws and faulty engineering when Defendant "sluiced the demineralizers in its Chemical and Volume Control System." Id. ¶ 11. The

students toured Maine Yankee on the morning of October 11, 1994, at which time, Defendant allegedly was in the process of repairing the leakage problem. *Id.* ¶¶ 1, 11, 13, 14, 15. Plaintiffs claim that "Maine Yankee officials had decided to flush out resin 'hot spots' in the demineralizer" and scheduled the procedure to occur during Plaintiffs' tour. *Id.* ¶ 15. Plaintiffs further allege that the officials were aware that the flushing procedure would release radioactive gases. *Id.* Plaintiffs claim that they were never apprised of the problems at Defendant's facility. *Id.* ¶¶ 16, 19.

Plaintiffs allege that each student was given a pocket-sized Self–Reading Dosimeter, which measures only gamma radiation. *Id.* ¶ 17. The students were not provided with Thermo–Luminescent Dosimeters, which also measure beta radiation and which are worn by the employees of Defendant. *Id.* ¶ 17.

Plaintiffs claim that despite his being warned that radioactive gases would be released in the PAB, the lead tour guide led the students into the "hot" side of the plant. *Id.* ¶¶ 18, 20. Plaintiffs allege that the tour guides knowingly took the students through a plume of unfiltered radioactive gases. *Id.* ¶¶ 35, 46. While the students were walking through the radioactive gases, the continuous air monitor in the PAB was sounding an alarm. *Id.* ¶ 35. After spending thirty to forty minutes on the "hot" side of the plant, the students returned to the "hot" side's entry point and stepped into portal monitors. *Id.* ¶ 23. Plaintiffs and the tour guides allegedly "alarmed out," indicating that they had all been exposed to excessive radioactive contamination from the tour. *Id.* ¶¶ 23, 24. In fact, Plaintiffs Bohrmann and Ortman continued to "alarm out" up to twenty minutes after they left the PAB. *Id.* ¶ 25.

Plaintiffs allege that Maine Yankee employees never suggested that the students remove their contaminated clothing or that the students take a shower and wash themselves. *Id.* ¶ 25. Two hours after the exposure to radioactive gases, Defendant told a few students that they needed to go for a "whole body count" to assess their radiation exposure. *Id.* ¶ 27. Plaintiff Gagnon allegedly was told that he had nothing to worry

about and was not told to undergo a whole body count. *Id.* ¶ 27. Plaintiffs claim that Maine Yankee employees falsely told them that they had not been subjected to gamma radiation and that only gamma radiation was "bad." *Id.* ¶ 28. Defendant's employees allegedly told Plaintiffs that they had not been exposed to anything that would pose a health risk. *Id.* ¶ 29.

Plaintiffs assert that Defendant did not promptly or accurately determine the radiation dose to which they had been subjected. *Id.* ¶ 39. Although urinalyses were done for the tour guides to determine possible inhalation of Strontium 89, Defendant did not offer to conduct such tests on Plaintiffs. *Id.* ¶ 39. Plaintiffs allege that Defendant belatedly used a whole body counter on a few of the students, but the device was not properly programmed to provide accurate readings. *Id.* ¶ 39. Defendant allegedly failed to calculate accurately the dose exposure for the students because Defendant's readings of exposure amounts were at least thirty to forty percent too low. *Id.* ¶¶ 39, 46. It is not known how much radioactive gas each student inhaled. *Id.* ¶ 47.

Plaintiffs assert that Defendant deliberately failed to report the contamination of Plaintiffs and the tour guides to the Nuclear Regulatory Commission or the State Nuclear Safety Inspector until after the contamination was reported in the media several days later. *Id.* ¶ 30. Plaintiffs allegedly did not become aware of the extent of their exposure until they read a newspaper report of the incident later that week. *Id.* ¶ 29. Defendant allegedly destroyed the charts showing the level of radioactive gases in the PAB soon after October 11, 1994. *Id.* ¶ 40. Plaintiffs assert that such destruction makes it impossible to quantify the release of radiation to which they had been exposed and allegedly constitutes a violation of federal regulations mandating the retention of the records. *Id.* ¶¶ 40, 44.

Plaintiff Bohrmann claims to have suffered a significant decrease in his white blood cell count. *Id.* ¶ 49. In addition, Plaintiffs allege that they live with "the significant distress and uncertainty caused by exposure to unreasonably high levels of nuclear radiation."

*Id.* ¶ 50. Plaintiffs now seek compensatory and punitive damages.

## II. *STANDARD FOR MOTION TO DISMISS*

 In entertaining this Motion to Dismiss, the Court assumes that all the factual allegations set forth in the Complaint are true and draws all reasonable inferences in favor of Plaintiffs. *Resolution Trust Corp. v. Driscoll,* 985 F.2d 44, 48 (1st Cir.1993). The Court, however, need not accept legal conclusions or bald assertions. *Id.* "Further, the Complaint should not be dismissed unless it appears beyond doubt that Plaintiffs can prove no set of facts which would entitle them to relief." *Wyman v. Prime Discount Sec.,* 819 F.Supp. 79, 81 (D.Me.1993).

## III. *DISCUSSION*

### A. *The Federal Public Liability Action*

Defendant first contends that a federal public liability action pursuant to the Price–Anderson Amendments Act of 1988 [the Amendments Act] provides the exclusive cause of action by which a plaintiff may recover for exposure to radiation associated with a licensed nuclear power facility. Defendant, therefore, contends that Plaintiffs' claims asserting state law theories of recovery should be dismissed.

In 1957, the original Price–Anderson Act was enacted as an amendment to the Atomic Energy Act of 1954. Prior to 1988, the Price–Anderson Act did not preclude a suit against a federally licensed nuclear facility in state court pursuant to state common law. For example, in *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), a federally licensed power plant was sued in a diversity action pursuant to common law tort principles under Oklahoma law.[1] In addition, the Court of Appeals for the Third Circuit concluded that there was no federal tort cause of action pursuant to the Price–Anderson Act and that the Act did not confer jurisdiction upon the federal courts. *Kiick v. Metropolitan Edison Co.,* 784 F.2d 490, 493 (3d Cir.1986); *Stibitz v. General Pub. Utils. Corp.,* 746 F.2d 993, 997 (3d Cir.1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985).

Congress subsequently enacted the Amendments Act in 1988, and in doing so, "the entire Price–Anderson landscape was transformed." *In re TMI Litig. Cases Consol. II,* 940 F.2d 832, 857 (3d Cir.1991), *cert. denied,* 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992). In fact, the Amendments Act changed the law from the way it existed as applied in *Silkwood, Kiick,* and *Stibitz.* The Amendments Act conferred jurisdiction on federal courts over any public liability action arising from a nuclear incident. 42 U.S.C. § 2210(n)(2). A "public liability action" is defined as any suit asserting liability arising out of any occurrence causing

---

1. In *Silkwood,* the nuclear facility contested the propriety of an award of punitive damages on the basis that such award is preempted by federal law. The Supreme Court, however, concluded that federal law had preempted state regulation of the safety aspects of nuclear energy but that the preemption did not extend to an award of punitive damages authorized under State law. In commenting on preemption law as it then existed, the Supreme Court stated as follows:

> No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.

> We do not suggest that there could never be an instance in which the federal law would pre-empt the recovery of damages based on state law. But insofar as damages for radiation injuries are concerned, pre-emption should not be judged on the basis that the Federal Government has so completely occupied the field of safety that state remedies are foreclosed but on whether there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law. We perceive no such conflict or frustration in the circumstances of this case.

*Silkwood,* 464 U.S. at 256, 104 S.Ct. at 625–26.

bodily injury, sickness, or disease resulting from the radioactive, toxic, explosive, or other hazardous properties of radioactive materials. *See id.* §§ 2014(e), (q), (w), (z), (aa), (hh) (setting forth interconnected definitions of "public liability action," "public liability," "nuclear incident," "source material," "special nuclear material," and "byproduct material").[2] Furthermore, the Amendments Act provide that "the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section." *Id.* § 2014(hh).

Courts have interpreted the Amendments Act's authorization of the public liability action in federal court to have supplanted the use of an independent state law cause of action for suits against federally licensed nuclear facilities seeking recovery for exposure to radiation. *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1099–1100 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994); *In re TMI Litig. Cases Consol. II,* 940 F.2d at 854–57; *see also Lujan v. Regents of the Univ. of California,* 69 F.3d 1511, 1513 (10th Cir.1995) (noting, but not reviewing, trial court holding that state law claims were preempted by the Price–Anderson Act); *James v. Southern California Edison Co.,* No. 94–0185–J (S.D.Cal. Dec. 13, 1994) (denying nuclear facility's motion to dismiss and deeming fifteen-count complaint based on state law to arise under the Price–Anderson Act). Although these courts have concluded that the public liability action is the exclusive cause of action for recovery, they also agree that state law provides the content for the new federal cause of action. *See also Caputo v. Boston Edison Co.,* 924 F.2d 11 (1st Cir.1991) (considering public liability action pursuant to state law theory of intentional infliction of emotional distress).

In *In re TMI Litig. Cases Consol. II,* the Court of Appeals for the Third Circuit determined that Congress had "supplant[ed] all possible state causes of action" with the public liability action. *In re TMI Litig. Cases Consol. II,* 940 F.2d at 857. The court explained as follows:

Under the terms of the Amendments Act, the 'public liability action' encompasses '*any* legal liability' of any 'person who *may* be liable' on account of a nuclear incident. 42 U.S.C. § 2014(hh) (emphasis added). Given the breadth of this definition, the consequence of a determination that a particular plaintiff has failed to state a public liability claim potentially compensable under the Price–Anderson Act is that he has no such claim at all. After the Amendments Act, no state cause of action based upon public liability exists. A claim growing out of any nuclear incident is compensable under the terms of the Amendments Act or *it is not compensable at all.* Any conceivable state tort action which might remain available to a plaintiff following the determination that his claim could not qualify as a public liability action, would not be based on 'any legal liability' of 'any person who may be liable on account of a nuclear incident.' It would be some other species of tort altogether, and the fact that the state courts might recognize such a tort has no relevance to the Price–Anderson scheme. At the threshold of every action asserting liability growing out of a nuclear incident, then, there is a federal definitional matter to be resolved: Is this a public liability action? If the answer to that question is 'yes,' the provisions of the Price–Anderson Act apply; there can be no action for injuries caused by the release of radiation from federally licensed nuclear power plants separate and apart from the federal public liability action created by the Amendments Act.

*In re TMI Litig. Cases Consol. II,* 940 F.2d at 854–55 (emphasis in original). Although the court concluded that there is no independent state law cause of action, the court determined that state law provides the foundation and content for the new federal cause of action. *Id.* at 855.

Similarly, in *O'Conner,* the Court of Appeals for the Seventh Circuit affirmed the district court's conclusion that the plaintiff

2. In this case, Plaintiffs' cause of action falls squarely within the definition of a public liability action, and therefore, this Court concludes that it is a public liability action.

could recover damages only by establishing a violation of the federal regulations. The plaintiff had filed a two-count negligence complaint in state court, and after Congress enacted the Amendments Act, the action was removed to federal district court [3] and recast as a public liability action. The court provided that "the broad definition of 'public liability action' embodied in the Price–Anderson Act implies that Congress has exercised power under Article I and has enacted a new and independent, indeed exclusive, cause of action," *O'Conner,* 13 F.3d at 1099 (footnote omitted), and that "a state cause of action is not merely transferred to federal court; instead a new federal cause of action supplants the prior state cause of action." *Id.* at 1099–1100. The Court further noted that "Congress desired that state law provide the content for and operate as federal law; however, Congress recognized that state law would operate in the context of a complex federal scheme which would mold and shape any cause of action grounded in state law." *Id.* at 1100.

■ This Court finds *O'Conner* and *In re TMI Litig. Cases Consol. II* persuasive and, therefore, adopts their reasoning. This Court concludes that a public liability action pursuant to section 2014(hh) is the sole cause of action for a plaintiff seeking damages for exposure to radiation from a federally licensed nuclear facility. Such conclusion, however, does not necessarily dispose of Plaintiffs' claims for relief pursuant to state law theories of liability. Instead, state law substantive rules of decision apply, and only those theories of relief that are inconsistent with federal law need be dismissed.[4] *See* 42 U.S.C. § 2014(hh).

## B. *Federal Standard of Care*

### 1. Which Regulations Apply?

■ This Court must first decide which federal regulations it should apply. Effective

January 1, 1994, the regulations in 10 C.F.R. part 20 were revised. 60 Fed.Reg. 36,038 (1995). Subsequently, the regulations were again amended effective August 14, 1995. *Id.* The incident giving rise to this suit occurred on October 11, 1994.

Plaintiffs contend that the most recent regulations should be applied retroactively to the facts of this case. Plaintiffs seek to benefit from changes in the regulations making the duty owed to a member of the public uniform regardless of whether the person is in a restricted area.

■ In the absence of clear legislative intent stating that the regulations should be applied retroactively, this Court will apply the regulations in effect at the time of the incident giving rise to the suit. *See Landgraf v. USI Film Products,* 511 U.S. 244, ——, 114 S.Ct. 1483, 1505, 128 L.Ed.2d 229 (1994) (concluding that statute would not be applied retroactively if such application "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed," unless there was clear congressional intent favoring retroactive application); *see also In re TMI,* 67 F.3d 1103, 1108 n. 10 (3d Cir.1995) (indicating that court would apply the regulations in place at the time of the TMI accident), *cert. denied,* —— U.S. ——, 116 S.Ct. 1034, 134 L.Ed.2d 111 (1996). In this case, there has been no manifestation of congressional intent that the newest regulations should be applied retroactively. Consequently, this Court will apply the regulations in effect as of October 11, 1994.[5]

The exposure limits contained within the regulations vary depending upon who is exposed to radiation and where the exposure takes place. In fact, under the regulations in

---

**3.** The Amendments Act contains a provision stating that any action arising out of a nuclear incident pending on the effective date of the Act could be removed to a federal district court. 42 U.S.C. § 2210(n)(2).

**4.** By their Complaint, Plaintiffs assert that this Court has jurisdiction "under 42 U.S.C. §§ 2011–2281 (the Atomic Energy Act) and under the principles of pendent jurisdiction." Complaint

¶ 9. This statement is incorrect in that this Court only has jurisdiction under section 2210(n)(2) of the Amendments Act.

**5.** All subsequent citations to the federal regulations will refer to the version of the Code of Federal Regulations revised as of January 1, 1995.

effect as of October 11, 1994, there are separate regulations for "members of the public" who are not in a "restricted area" and for anybody who is in a "restricted area." *Compare* 10 C.F.R. § 20.1201 (occupational dose limits) *with* 10 C.F.R. § 20.1301 (radiation dose limits for "members of the public"). Because Plaintiffs allegedly were exposed to radiation in a restricted area, they are not "members of the public," and the radiation dose limits for "members of the public" contained within 10 C.F.R. § 20.1301 do not apply to them.[6] Instead, the occupational dose limits contained within 10 C.F.R. §§ 20.1201–20.1208 apply to them.

### 2. Duty of Care Under Federal Regulations

The parties contest whether in addition to the federal exposure limits contained within 10 C.F.R. §§ 20.1201–20.1208, a proper standard of care under the federal regulations is the standard provided by the ALARA standards contained within 10 C.F.R. Part 50.

ALARA is an acronym for "as low as is reasonably achievable,"[7] and federally licensed nuclear facilities are required to "use, to the extent practicable, procedures and engineering controls based upon sound radiation protection principles to achieve occupational doses and doses to members of the public that are as low as is reasonably achievable (ALARA)." 10 C.F.R. § 20.1101(b). In addition to the ALARA standard within 10 C.F.R. Part 20, Plaintiffs have also alleged that Defendant violated the ALARA standard within 10 C.F.R. Part 50 concerning design objectives and operation objectives.[8] 10 C.F.R. §§ 34a(a), 36a(a). The occupational dose limits are set forth at 10 C.F.R. §§ 20.1201–20.1208. In comparison, the ALARA standard is much more stringent than the standards contained within the occupational dose limits.

The issue of whether the proper standard of care is the ALARA standard or the occupational dose limits previously has been addressed in *In re TMI*, in which the court concluded that the occupational dose limits define the proper standard of care for public liability actions. *In re TMI*, 67 F.3d at 1114–15; *see also O'Conner v. Commonwealth Edison Co.*, 748 F.Supp. 672, 675–78 (C.D.Ill.

---

**6.** This result is reached because a "member of the public" is defined as "an individual in a controlled or unrestricted area. However, an individual is not a member of the public during any period in which the individual receives an occupational dose." 10 C.F.R. § 20.1003. An "occupational dose" is defined as "the dose received by an individual in a restricted area." *Id.* A "restricted area" is defined as "an area, access to which is limited by the licensee for the purpose of protecting individuals against undue risks from exposure to radiation and radioactive materials." *Id.*

**7.** ALARA is defined as:
making every reasonable effort to maintain exposures to radiation as far below the dose limits in this part [10 C.F.R. Part 20] as is practical consistent with the purpose for which the licensed activity is undertaken, taking into account the state of technology, the economics of improvements in relation to state of technology, the economics of improvements in relation to benefits to the public health and safety, and other societal and socioeconomic considerations, and in relation to utilization of nuclear energy and licensed materials in the public interest.
10 C.F.R. § 20.1003.

**8.** As concerns design objectives, the regulations provide as follows:

An application for a permit to construct a nuclear power reactor shall include a description of the preliminary design of equipment to be installed to maintain control over radioactive materials in gaseous and liquid effluents produced during normal reactor operations, including expected operational occurrences. In the case of an application filed on or after January 2, 1971, the application shall also identify the design objectives, and the means to be employed, for keeping levels of radioactive material in effluents to unrestricted areas as low as is reasonably achievable. The term "as low as is reasonably achievable" as used in this part means as low as is reasonable taking into account the state of technology, and the economics of improvements in relation to benefits to the public health and safety and other societal and socioeconomic considerations, and in relation to the utilization of atomic energy in the public interest. The guides set out in appendix I to this part [10 C.F.R. Part 50] provide numerical guidance on design objectives for light-water-cooled nuclear power reactors to meet the requirements that radioactive material in effluents released to unrestricted areas be kept as low as is reasonably achievable. *These numerical guides for design objectives and limiting conditions for operation are not to be construed as radiation protection standards.*
10 C.F.R. § 50.34a(a) (emphasis added).

1990) (concluding that federal permissible dose limits set the standard of care under Illinois law), *aff'd,* 13 F.3d 1090, 1103 n. 11 (7th Cir.1994); *Coley v. Commonwealth Edison Co.,* 768 F.Supp. 625, 628–29 (N.D.Ill. 1991) (stating that occupational dose limits are the standard of care); *Whiting v. Boston Edison Co.,* 891 F.Supp. 12, 14 (D.Mass.1995) (noting that court had previously ruled that whole body external dose limits define the duty of care owed by Defendant to workers at its nuclear power plant). This Court is persuaded by the analysis set forth in *In re TMI* and, accordingly, adopts the reasoning stated therein.

In concluding that ALARA is not the standard of care, the Court of Appeals for the Third Circuit articulated three reasons. First, the federal regulations specifically state that the ALARA guidelines set forth in Appendix I to 10 C.F.R. Part 50 " 'are not to be construed as radiation protection standards.' " *In re TMI,* 67 F.3d at 1114 (quoting 10 C.F.R. § 50.34a). Second, the regulation that incorporated the ALARA guidelines emphasized that the guidelines are not radiation protection standards. *Id.* at 1114–15 (citing 40 Fed.Reg. 19439, 19439–40 (1975)). Third, adopting the ALARA standard would result in an ordinary negligence standard and would allow juries to decide issues explicitly reserved to the federal government.[9] *Id.* at 1115.

■ This Court concludes that the occupational dose limits set forth at 10 C.F.R. §§ 20.1201–20.1208 articulate the proper standard of care rather than the ALARA guidelines set forth in Appendix I to 10 C.F.R. Part 50.

## C. *What State Theories of Liability are Consistent with Federal Law*

■ As set forth above in section III.A., *supra,* state law provides the content for a public liability action except where it is inconsistent with federal substantive law. The Court must, therefore, determine which state theories of liability contained in Plaintiffs' Complaint are inconsistent with federal law.

### 1. Negligence Standard of Care

The issue whether federal law preempts the standard of care in a state negligence claim in a public liability action was first addressed in *In re TMI Litig. Cases Consol. II.* There, the court concluded that state negligence law was preempted as the applicable standard of care because federal regulation in nuclear safety was pervasive and federal law had regulated the dose of radiation a person could receive. *In re TMI Litig. Cases Consol. II,* 940 F.2d at 859–60; *see also In re TMI,* 67 F.3d at 1107 (relying on *In re TMI Litig. Cases Consol. II* for conclusion that "federal law determines the standard of care and preempts state tort law"); *O'Conner,* 13 F.3d at 1105 (concluding that regulation of nuclear safety had been preempted by federal law, precluding states from imposing a non-federal duty of care); *Coley,* 768 F.Supp. at 628–29 (concluding that NRC regulations determine the negligence standard of care).

■ This Court agrees with *In re TMI Litig. Cases Consol. II* and concludes that federal regulation has occupied the field of nuclear safety law and that federal law has preempted states from imposing any standard of care different from the federal safety standards. Consequently, the Court concludes that federal law sets forth the duty of reasonable care owed to Plaintiffs, and Plaintiffs must establish a breach of such standard to recover for the damages claimed on those theories of negligence and negligent infliction of emotional distress.

---

9. The court stated as follows:

Adopting ALARA as part of the standard of care would put juries in charge of deciding the permissible levels of radiation exposure and, more generally, the adequacy of safety procedures at nuclear plants—issues that have explicitly been reserved to the federal government in general and the NRC specifically.

Adoption of a standard as vague as ALARA would give no real guidance to operators and would allow juries to fix the standard case by case and plant by plant. An operator acting in the utmost good faith and diligence could still find itself liable for failing to meet such an elusive and undeterminable standard. Our holding protects the public and provides owners and operators of nuclear power plants with a definitive standard by which their conduct will be measured.

*Id.* at 1115 (citation and footnotes omitted).

### 2. Strict Liability

 Plaintiffs' claim pursuant to a strict liability theory is inconsistent with the federal regulatory scheme because Plaintiffs could recover pursuant to such a claim without first establishing that Defendant breached a federally imposed standard of care. Therefore, the Court will grant Defendant's Motion to Dismiss for Count IV.

### 3. Failure to Report

 The Court further concludes that Plaintiffs may not recover pursuant to Count VIII of their claim alleging that Defendant failed to meet safety reporting requirements imposed by state law, 35–A M.R.S.A. § 4334(1)(A), because recovery in a civil action pursuant to such statute has been preempted by federal reporting and safety regulations. *See* 10 C.F.R. Parts 20, 21.

### 4. Intentional Torts

 As concerns Plaintiffs' claims for damages pursuant to theories of intentional infliction of emotional distress and battery, the Court concludes that such intentional tort claims are not inconsistent with the federal safety standards. To recover on either theory, Plaintiffs must demonstrate that Defendant intentionally exposed Plaintiffs to radiation without their consent, and that such intentional conduct on the part of Defendant caused them damages. *See, e.g., Latremore v. Latremore,* 584 A.2d 626, 631 (Me.1990) (setting forth elements of intentional infliction of emotional distress); *Pattershall v. Jenness,* 485 A.2d 980, 984 (Me.1984) (an element of battery is an intentional act).[10]

There is no reason apparent to this Court to believe that Congress intended that a defendant be insulated from liability for its intentional acts solely by complying with the federal safety standards. Instead, compliance with the federal regulations merely demonstrates the absence of negligence. *See Coley,* 768 F.Supp. at 629. The federal safety standards have no bearing on a defendant's liability for its intentional acts. While a plaintiff may recover on an intentional tort theory without proving exposure to radiation exceeding the federal safety standards, a plaintiff may not recover without first proving that he sustained damages, and such proof may be difficult to establish in the absence of proving a violation of the federal safety standards. *See, e.g., Laswell v. Brown,* 683 F.2d 261, 269 (8th Cir.1982) (concluding that "lawsuit for personal injuries cannot be based only upon the mere possibility of some future harm"), *cert. denied,* 459 U.S. 1210, 103 S.Ct. 1205, 75 L.Ed.2d 446 (1983); *Johnston v. United States,* 597 F.Supp. 374, 425–26 (D.Kan.1984); *Bubash v. Philadelphia Elec. Co.,* 717 F.Supp. 297, 300 (M.D.Pa.1989) (concluding that mere exposure to radiation is not an actionable physical injury). Nevertheless, the absence of a violation of the federal standards does not necessarily establish the absence of an actual injury.

### 5. Fraud

 Similarly, Plaintiffs' claim for fraud is not inconsistent with federal law. The federal safety regulations do not immunize a defendant from liability for making fraudulent representations to persons either before or after subjecting them to radiation.[11]

### D. Sufficiency of Complaint

#### 1. Federal Regulations standard of care

 Defendant contends that Plaintiffs have alleged only a violation of ALARA and, therefore, have failed to plead a breach of the appropriate standard of care. Plaintiffs counter that they have set forth sufficient facts which could prove that they were ex-

---

**10.** The Court intimates no opinion as to whether the facts as alleged by Plaintiffs amount to physical contact so as to constitute a battery.

**11.** Under Maine law, a defendant is liable for fraud or deceit if he (1) makes a false representation, (2) of a material fact, (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to the plaintiff's damage. *Diversified Foods, Inc. v. First Nat'l Bank of Boston,* 605 A.2d 609, 615 (Me.1992); *Letellier v. Small,* 400 A.2d 371, 376 (Me.1979).

posed to radiation in excess of the occupational dose limits.

Although Plaintiffs principally rely on the ALARA guidelines as the standard of care in their Complaint, this Court concludes that Plaintiffs have alleged facts sufficient to support a determination that they have been exposed to radiation in excess of the occupation dose limits. Plaintiffs have alleged that the procedures conducted by Defendant led to significant radiation dose rates ranging "from the tens of rem to upwards of thousands of rem," that the air vented into the PAB was not filtered, that they were led through a radioactive plume of gas, that they inhaled unknown amounts of radioactive gases, and that Defendant is legally liable pursuant to the Atomic Energy Act. Complaint ¶¶ 18, 32, 35, 46, 47, 74. Because Plaintiffs may well be able to prove that they were exposed to radiation exceeding the occupational dose limits, the Court will deny Defendant's Motion to Dismiss with respect to Plaintiffs' federal public liability claim (Count VI).

## 2. "Particularity Requirement"

 Pursuant to Federal Rule of Civil Procedure 9(b), a complaint alleging fraud must allege the circumstances constituting the fraud with specificity.[12] The Court of Appeals for the First Circuit, as well as this Court, has repeatedly required strict compliance with the particularity requirement of Rule 9(b). See, e.g., Greenstone v. Cambex Corp., 975 F.2d 22, 25 (1st Cir.1992); Romani v. Shearson Lehman Hutton, 929 F.2d 875, 878 (1st Cir.1991); New England Data Servs., Inc. v. Becher, 829 F.2d 286, 290 (1st Cir.1987); Wyman, 819 F.Supp. at 81; In re One Bancorp Sec. Litig., 135 F.R.D. 9, 12 (D.Me.1991). The three purposes of the particularity requirement are "(1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their

reputations." New England Data Servs., Inc., 829 F.2d at 289.

 To meet Rule 9(b)'s particularity requirement, the plaintiff must specify the time, place and content of an alleged false representation. Romani, 929 F.2d at 878; In re One Bancorp, 135 F.R.D. at 12. "Although a plaintiff need not specify the circumstances or evidence from which fraudulent intent could be inferred, the complaint must provide some factual support for the allegations of fraud." Romani, 929 F.2d at 878.

 In this case, Plaintiffs have made sufficient allegations to comply with the particularity requirement. Plaintiffs have alleged that Defendant made false, material misrepresentations that Plaintiffs could safely go inside the PAB, that Plaintiff Gagnon was told he had nothing to worry about, that Plaintiffs had not been exposed to gamma radiation, that only gamma radiation was bad, and that there were no health risks associated with what happened. Complaint ¶¶ 21, 27, 28, 29. Furthermore, Plaintiffs have specified the time and place of the alleged misrepresentations. Complaint ¶¶ 1, 13. Plaintiffs allegedly relied on the representations by entering the PAB and by not seeking immediate treatment.

These allegations give Defendant notice of the alleged circumstances constituting the fraud so that Defendant can prepare a meaningful defense. In addition, the allegations satisfy the Court that the claim is neither a pretext to discovering a wrong nor a frivolous charge intended to damage Defendant's reputation. Because these allegations satisfy the purposes of the particularity requirement, this Court will not dismiss the fraud claim for failure to make the allegations with specificity.

## IV. CONCLUSION

Accordingly, it is ORDERED that Defendant's Motion to Dismiss be, and it is hereby, GRANTED as to Counts IV (strict liability)

12. Federal Rule of Civil Procedure 9(b) provides: In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

and VIII (failure to meet state safety reporting requirements). It is further *ORDERED* that Defendant's Motion to Dismiss be, and it is hereby, *DENIED* as to all other counts.