Cynthia D. SMITH, Individually, as Guardian and Next Friend of Sara Smith and Benjamin Smith, and as Executrix of the Estate of Thomas B. Smith

v.

**GENERAL ELECTRIC COMPANY and Boston Edison Company.**

Civil Action No. 91–12912–RGS.

United States District Court, D. Massachusetts.

Sept. 6, 1996.

---

Edward T. Dangel, III, Dangel, Donlan & Fine, Boston, MA, for Thomas B. Smith, Cynthia D. Smith.

Michael R. Heyison, William F. Lee, Michael R. Heyison, Hale & Dorr, Boston, MA, for General Electric Corp., Boston Edison Company.

*Memorandum and Order on a Motion for Judgment on the Pleadings*

STEARNS, District Judge.

This case was brought on behalf of Thomas Smith, an electrician who worked at the Pilgrim Station nuclear power plant between 1972 and 1988. Smith died in 1993 after contracting chronic myelocytic leukemia. The Complaint, as originally filed, alleged various state law causes of action against defendant Boston Edison Company, the owner of the plant, and a second defendant, the General Electric Company, the supplier of Pilgrim Station's fuel rods. Before the court is a motion by General Electric (GE) seeking judgment on the pleadings, or more precisely, its dismissal from the case.

## PROCEDURAL BACKGROUND

The First Amended Complaint, filed on November 12, 1991, contained eight counts: I-negligence (Boston Edison); II-negligence (GE); III-implied warranty (GE); IV-strict liability (GE); V-abnormally dangerous activity (Boston Edison and GE); VI-loss of consortium by the Smith children (both defendants); VII-loss of consortium by Smith's wife (both defendants); and VIII-violation of the consumer protection statute, M.G.L. c. 93A (GE). On April 23, 1993, the plaintiff filed a suggestion of death, along with a motion to add a wrongful death claim against both defendants. That motion was unopposed.

In a September 14, 1993 Memorandum and Order, Judge Mazzone allowed the defendants' motions for summary judgment on counts I, II, III, and V of the First Amended Complaint on statute of limitations grounds (count IV was also dismissed after the plaintiff conceded there was no basis in Massachusetts law on which to found a theory of strict liability). On September 16, 1993, Judge Mazzone allowed the plaintiff's earlier filed motion to file a supplemental Complaint, which added the wrongful death action as Count IX.[1] Although the surviving counts are framed under Massachusetts law, they constitute a federal cause of action (a "public liability action") under the rubric of the Price–Anderson Act, 42 U.S.C. §§ 2014(w), 2210(n)(2), which as will be explained, is a plaintiff's exclusive remedy for the recovery

1. The case was transferred to this session on February 18, 1994.

of damages sustained in a "nuclear incident." [2]

## FACTS

■ When considering a motion for a judgment on the pleadings, the court accepts the facts alleged in the Complaint as true and views any reasonable inference implicit in the pleadings in the light most congenial to the nonmoving party. 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: § 1368, at 518–519. The material facts in the pleadings are these. Thomas Smith contracted chronic myelocytic leukemia in 1988 as a result of his exposure to excessive levels of ionizing radiation while working at Pilgrim Station. The radiation emanated in part from defective fuel rods in the plant's reactor. The fuel rods were manufactured by GE. More specifically, the Complaint in its amended form alleges that Boston Edison failed to warn Smith of the dangers of excessive exposure to radiation, and that it failed to protect him against such exposure. GE is alleged to have failed to warn Smith that the fuel rods it supplied to Boston Edison were hazardous to workers at the plant, and that GE breached various implied warranties by manufacturing and selling fuel rods that it knew were unreasonably dangerous and unfit for their intended purpose. The acts and omissions of the defendants are variously alleged to have been negligent, grossly negligent, willful, wanton and malicious.

## DISCOVERY STATUS

The parties originally agreed to a phased discovery plan deferring the question of GE's potential liability until Smith's cumulative radiation dose had been at least tentatively established.[3] Step 1 of the discovery plan obligated Boston Edison to locate and produce certain related categories of documents identified by the plaintiff. Step 2 allowed Boston Edison to depose members of Smith's family. Step 3 authorized the plaintiff to depose Boston Edison witnesses on three specific subjects: (a) Smith's occupational radiation exposure; (b) health physics and ALARA[4] practices at Pilgrim Station during the relevant periods; and (c) the nature and extent of Boston Edison's document search. Step 4 provided that after the initial depositions, the plaintiffs could move to compel further discovery, including information related to fuel issues (that is, GE's potential liability). The final step of the discovery plan provided for the deposition of expert witnesses.

Steps 1 and 2 of the discovery plan are complete. Boston Edison has produced over 35,000 documents, including gate sheets, work orders issued to Smith's employers, lists of radiation work permits issued during the years that Smith was employed at Pilgrim Station, and Smith's dosimetry records. Boston Edison in turn has deposed Smith's family members.

Instead of proceeding to Step 3 of the discovery plan as contemplated, on February 13, 1995, the plaintiff sought extensive discovery from GE, specifying thirty-two topics concerning the design, quality, testing, and alleged defects of GE's nuclear fuel rods. In a lengthy status report submitted by the defendants in advance of a May 25, 1995 conference, the defendants asserted that the fuel issues are irrelevant to any determination of liability or damages. The parties agreed to postpone the GE discovery in light of GE's claim that it should be dismissed as a party. The parties also agreed that discovery not affected by the fuel rod issue would proceed in the ordinary course, while the issue of GE's participation in the lawsuit was resolved.

---

**2.** A "nuclear incident" is defined in relevant part as any occurrence causing "bodily injury, sickness, disease, or death ... arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." See 42 U.S.C. § 2014(q).

**3.** The plaintiff has no cause of action unless she is able to establish that Smith's exposure exceed-

ed the whole body external dose limits established by 10 C.F.R. Part 20 which define as a matter of federal law the duty of care owed by a nuclear plant operator to its workers. See *In re TMI (TMI III)*, 67 F.3d 1103, 1114–1115 (3d. Cir.1995).

**4.** The hortatory "as low as reasonably achievable" standard. See 10 C.F.R. Parts 20 & 50.

### THE PRICE–ANDERSON ACT

Adopted in 1957 to foster the commercial development of nuclear energy, the Price–Anderson Act established a public/private insurance pool covering potential victims of peace-time nuclear accidents. See *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 63–65, 98 S.Ct. 2620, 2625–2626, 57 L.Ed.2d 595 (1978). The Act required private nuclear power operators to obtain the "amount of liability insurance available from private sources," an amount totalling $60 million in 1957, 42 U.S.C. § 2210(b), *Duke Power*, 438 U.S. at 64–65, 98 S.Ct. at 2625–2626, and provided a supplementary federal indemnity guarantee of $500 million. See 42 U.S.C. § 2210(c). The Act capped liability for any single nuclear "incident" at $560 million, 42 U.S.C. § 2210(e)(1)(C), and mandated that "any legal liability ... [of any] person who may be liable for public liability" (over and above the private insurance requirement) be channeled to the federal insurance pool. 42 U.S.C. §§ 2014(t)(w); see also 42 U.S.C. § 2210(d). The Act was designed to serve as "the means by which persons suffering damage from a nuclear incident may obtain rapid and adequate financial compensation." S.Rep. No. 650, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.C.C.A.N. 3209, 3220–3221.

Despite Congressional assurances, critics complained that the Price–Anderson damages cap and liability channeling mechanism unfairly shielded the nuclear industry from full responsibility for a nuclear catastrophe. In *Carolina Environmental Study Group, Inc. v. U.S. Atomic Energy Commission*, 431 F.Supp. 203, 222–223 (W.D.N.C.1977), the district court echoed the arguments of these critics, holding the Act unconstitutional because "[t]he amount of recovery [it provides] is not rationally related to the potential losses ..., [its channeling provision] tends to encourage irresponsibility in matters of safety and environmental protection ..., [and because] there is no quid pro quo" for the liability cap. The Supreme Court reversed, explaining that the Act created no disincentive for safety because no nuclear utility could financially survive the calamity of a serious nuclear accident whatever the dollar ceiling imposed by the Act. *Duke Power*, 438 U.S. at 85, 98 S.Ct. at 2636. The Court described the $560 million damages cap as simply a "starting point" or a "working hypothesis," and noted that Congress had stated its intention to make additional funds available if needed. *Id.*, at 85 and n. 29, 98 S.Ct. at 2637 and n. 29. See also 42 U.S.C. § 2210(e)(2):

> In the event of a nuclear incident involving damages in excess of the amount of aggregate public liability under paragraph (1), the Congress will thoroughly review the particular incident in accordance with the procedures set forth in subsection (i) of this section and will in accordance with such procedures, take whatever action is determined to be necessary (including approval of appropriate compensation plans and appropriate of funds) to provide full and prompt compensation to the public for all public liability claims resulting from a disaster of such magnitude.

Finally, the Court expressed confidence that the Act offered a fair quid pro quo to the public. While the Act abrogated certain common law rights, it gave claimants a faster, more efficient route to recovery, and "guarantee[d] a level of net compensation generally exceeding that recoverable in private litigation [against individually culpable entities]." *Duke Power*, 438 U.S. at 93, 98 S.Ct. at 2640.

The *Duke Power* decision did not examine the right of a plaintiff to sue a federally licensed nuclear operator in state court under state theories of law. In *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984), a diversity action brought under Oklahoma law, the estate of Karen Silkwood was awarded ten million dollars in punitive damages after Silkwood was shown to have been contaminated by nuclear radiation. The Tenth Circuit vacated the award, holding the punitive damages claim pre-empted by the Price–Anderson Act. The Supreme Court reversed.

In sum, it is clear that in enacting and amending the Price–Anderson Act, Congress assumed that state-law remedies, in whatever form they might take, were avail-

able to those injured by nuclear incidents. This was so even though it was well aware of the NRC's exclusive authority to regulate safety matters. No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.

We do not suggest that there could never be an instance in which the federal law would pre-empt the recovery of damages based on state law. But insofar as damages for radiation injuries are concerned, pre-emption should not be judged on the basis that the Federal Government has so completely occupied the field of safety that state remedies are foreclosed but on whether there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law. We perceive no such conflict or frustration in the circumstances of this case.

*Silkwood*, 464 U.S. at 256, 104 S.Ct. at 625.

In another important case, *Kiick v. Metropolitan Edison Co.*, 784 F.2d 490 (3rd Cir. 1986), persons living near the ill-starred Three Mile Island nuclear facility brought "public liability actions" in federal court against

> the owners and operators of the TMI facility, together with those companies that supplied design, engineering, or maintenance services, or that were vendors of

systems or equipment incorporated in the facility. Each defendant is a "person indemnified" as defined in the Price–Anderson Act, 42 U.S.C. § 2014(t), through the "financial protection" system required by the Act, 42 U.S.C. § 2210(k).

*Kiick*, 784 F.2d at 491. Because the concept of a "public liability action" was borrowed directly from the Price–Anderson Act, the parties stipulated that "the district court's continued exercise of ... jurisdiction [over the case] was 'obviously correct,'" but asked the Appeals Court to resolve the question whether "[a]s a matter of federal law ... punitive damages [are] recoverable in public liability actions under the [Act]." *Id.* at 492 & n. 1. Ignoring the issue framed by the parties, the Third Circuit held that "the Price–Anderson Act itself creates no cause of action or remedy in plaintiffs," and moreover, that the federal courts had no jurisdiction over anything labeled a "public liability action." *Id.* In the Third Circuit's view, the Price–Anderson Act did little more than establish a federal funding mechanism for monetary awards in nuclear tort actions.

> [T]he Price–Anderson Act's legislative history [is] replete with indications that Congress never intended to displace state tort law with respect to the issues of liability and recoverable damages for nuclear accidents.... [A]fter carefully reviewing the language employed by the Supreme Court in *Duke Power*, we conclude that petitioners' claim that the Price–Anderson Act "replaced" or somehow "federalized" state tort law is so completely devoid of merit as to not involve a federal controversy within the jurisdiction of a federal court.

*Kiick*, 784 F.2d at 493.

### The 1988 Amendments Act

In response to the *Silkwood* and *Kiick* decisions, Congress amended the Price–Anderson Act in 1988 to give more definite meaning to the term "public liability action."[5] The Amendments Act specifically declared the "public liability action" to be a federal cause of action, and conferred origi-

---

5. The basic definition of a "public liability" action (left unchanged by the Amendments Act), is "any legal liability arising out of or resulting

from a nuclear incident or precautionary evacuation." 42 U.S.C. § 2014(w).

nal and removal jurisdiction over nuclear tort cases on the federal district court, including cases filed prior to the Act's passage. See 42 U.S.C. § 2210(n)(2). Congress then added the following proviso.

> A public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provision of such section.

42 U.S.C. § 2014(hh). Congress, in effect, created a jurisprudential curiosity, an action grounded in state law committed to the exclusive jurisdiction of the federal courts.[6]

Immediately after passage of the Amendments Act, the Three Mile Island defendants removed their cases to the district court. The plaintiffs, while not contesting the intent of the Act, moved for remand on grounds that "Congress lacked authority to create a federal forum for public liability actions." See *In Re TMI Consolidated Cases II (TMI II)*, 940 F.2d 832, 837 (3rd Cir.1991). The district court allowed plaintiffs' motion, reasoning that Congress had exceeded its authority under Article III, § 2 of the United States Constitution by passing a law purely jurisdictional in nature.

In *TMI II*, 940 F.2d at 836, the Third Circuit reversed the district court. Beginning with the landmark case of *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat) 738, 6 L.Ed. 204 (1824), the Court of Appeals analyzed the history of "arising under" jurisprudence, concluding that "where Congress has the authority to legislate in a given area and substantively does so, a grant of federal subject matter jurisdiction will survive an Article III challenge." *TMI II*, 940 F.2d at 850. While acknowledging the argument

that "Congress' grant of federal jurisdiction over public liability actions would require that the federal courts apply the same law which a state court would have applied in an action under state common law," *id.* at 837, the Court of Appeals faulted the district court for failing to recognize that "[t]hrough the Amendments Act, Congress has placed an overlay of federal law upon the rights and remedies previously available under state law . . . [such] that the Act, while relying for definition upon state law elements, contains the federal components necessary to survive [a] constitutional challenge." *Id.* at 857, 858.

## DISCUSSION

The defendants (represented by the same counsel) argue that since the Price–Anderson Act channels the "legal liability" of any "person who may be liable for public liability" to the special insurance pool in which all NRC licensees (including Boston Edison) are obligated to participate, any injury suffered by Smith (or his survivors) is fully compensable by Boston Edison. GE by this reasoning is a redundant party to the lawsuit. More fundamentally, the defendants contend that the channelling provisions of the Act affirmatively bar plaintiff from even naming GE as a party.

At its core, the defendants' argument is one of strict preemption. They contend that in fleshing out the contours of a "public liability action" in the 1988 Amendments Act, Congress implicitly pre-empted all state-based causes of action, including actions against indemnified parties like GE who would ordinarily be treated as joint tort feasors under state law.[7] Plaintiffs respond that 42 U.S.C. § 2014(hh) simply overlays a federal cause of action on existing state-based claims. "The [public liability] cause of

---

**6.** The Amendments Act also disallowed punitive damages in cases "where the United States is obligated to make indemnification payments on behalf of a particular defendant. 42 U.S.C. § 2210(s)." See *In Re TMI (TMI IV)*, 67 F.3d 1119, 1122 (3d Cir.1995).

**7.** The defendants claim that a complete pre-emption position is buttressed by *In re TMI Litigation Cases Consol. II*, 940 F.2d at 854, 857, where the Third Circuit held that:

> [a]fter the Amendments Act [of 1988], no state cause of action based upon public liability exists. A claim ongoing out of any nuclear incident is compensable under the terms of the Amendments Act or it is not compensable at all.... Congress clearly intended to supplant all possible state causes of action when the factual prerequisite[s] of the statute are met.

action does not supplant state tort law principles because Section (hh) limits state remedies only when they contradict Section 2210. The 1988 amendments have the effect of broadening rather than limiting a plaintiff's remedies in federal court." Plaintiffs' Memorandum, at 19.

Defendants correctly assert that the duty of care owed by an operator of a nuclear plant to its workers and the public at large is governed by federal law. See 10 C.F.R. Part 20 (the NRC Federal Permissible Dose Limits); *TMI III*, 67 F.3d at 1107; *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1103 n. 11 (7th Cir.1994); *Whiting v. Boston Edison Company*, 891 F.Supp. 12, 14 (D.Mass.1995). Complete pre-emption of state causes of action, however, even in light of the 1988 Amendments Act, does not necessarily follow.

> As we recently observed in *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n*, 461 U.S. 190 [103 S.Ct. 1713, 75 L.Ed.2d 752] (1983), state law can be pre-empted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is pre-empted. Id., at 203–204 [103 S.Ct. at 1721–1722]; *Fidelity Federal Savings & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664] (1982); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947). If Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 [83 S.Ct. 1210, 1217–1218, 10 L.Ed.2d 248] (1963), or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress, *Hines v. Davidowitz*, 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581] (1941). *Pa-*

*cific Gas & Electric*, supra [461 U.S.] at 204 [103 S.Ct. at 1722].

*Silkwood*, 464 U.S. at 248, 104 S.Ct. at 621.

The 1988 Amendments Act explicitly preserves state law causes of action to the extent that they are not "inconsistent" with federal law. 42 U.S.C. § 2014(hh).[8] The pre-emptive component of the Act thus means only that " 'plaintiffs' rights will necessarily be determined, *in part,* by reference to federal law.' " *TMI III*, 67 F.3d at 1107, quoting *TMI II*, 940 F.2d at 860 (emphasis added). As the *TMI III* Court pointed out, its earlier TMI cases had pre-empted only state prescribed standards of the duty of care, they "did *not* address whether federal law also controlled other aspects of plaintiffs' claims, such as causation and damages." *Id.* at 1107 (emphasis added).

■ While I do not consider defendants' view untenable, it is inconsistent with the accepted rules of pre-emption. "Ordinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law." *California v. ARC America Corp.*, 490 U.S. 93, 105, 109 S.Ct. 1661, 1667, 104 L.Ed.2d 86 (1989). For example, in *Medtronic, Inc. v. Lohr*, —— U.S. ——, ——, 116 S.Ct. 2240, 2255, 135 L.Ed.2d 700 (1996), the Supreme Court held that the comprehensive federal regulations governing the marketing of medical devices did not pre-empt otherwise compatible state-based causes of action.

> Nothing in [the statute] denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements.... The presence of a damages remedy does not amount to the additional or different 'requirement' that is necessary under the statute; rather, it merely provides another reason for manufacturers to comply with identical existing 'requirements' under federal law.

More fundamentally, the defendants' interpretation of the impact of the 1988 Amendments Act appears to misread the TMI cases

---

**8.** Plaintiff's correctly point out that this phrase is "the less intrusive form of pre-emption suggested by the *Silkwood* Court, the one that leaves state tort law in place except where it actually conflicts with federal law." Plaintiffs' Memorandum, at 15–16.

on which it relies. Far from holding that the federal "public liability action" displaced state common law theories of recovery, the Third Circuit in *TMI II* was forced to explore the outer reaches of "arising under" jurisdiction to justify the Act's constitutionality in light of the district court's considered objection that "the Amendments Act did [nothing to] change the fact that the plaintiffs' rights arose [almost exclusively] under state law...." *TMI II*, 940 F.2d at 837.[9] See also *Bohrmann v. Maine Yankee Atomic Power Company*, 926 F.Supp. 211, 218 (D.Maine 1996) ("[A] public liability action ... is the sole cause of action for a plaintiff seeking damages for exposure to radiation from a federally licensed nuclear facility ..., however, [this fact] does not necessarily dispose of Plaintiffs' claims for relief pursuant to state law theories of liability. Instead, state law substantive rules of decision apply, and only those theories of relief that are inconsistent with federal law need be dismissed."); *Corcoran v. New York Power Authority, et. al.*, 935 F.Supp. 376, 386 (S.D.N.Y.1996) ("The mere fact that all causes of action arising out of a 'nuclear incident' are federal in nature does not eliminate plaintiff's ability to assert claims the rules of decision of which are derived from state law.... That there is no monolithic PLA (as defendants vigorously argue) is clear from the Third Circuit's reasoning in *TMI II*.").

▮ The purpose of the channeling provision of the Price–Anderson Act is to make third party vendors like GE indemnitees of nuclear plant operators like Boston Edison. The Act does not exonerate GE of its legal *liability*, it merely shifts the obligation to pay *damages* to Boston Edison. The distinction between an indemnitee and a party immune from suit is critical, especially in a punitive damages context. As the Third Circuit pointed out in *TMI IV*,[10] the limitation on punitive damages in the 1988 Amendments Act applies only when the United States is the indemnifying party, see 42 U.S.C. § 2210(s); "punitive damages are available [on a state law based theory of recovery] so long as the money to pay such awards does not come from the United States Treasury." *TMI IV*, 67 F.3d at 1122. Noting that in *Silkwood* the Supreme Court "explicitly found that 'exposure to punitive damages [does not] frustrate any purpose of the federal remedial scheme,'" *id.*, the Third Circuit concluded that "[t]he Amendments Act was not intended to alter the nature of the tort claims which constitute public liability actions." *Id.* at 1123. In short, a claim for punitive damages may be asserted directly against a defendant who "supplied materials or services" to a nuclear power plant so long as such an award is authorized by the law of the forum state. *Id.* at 1121. See also *Corcoran*, supra at 390 (denying motion to dismiss state based claims against non-licensee because "it is incongruous to argue that contractors cannot be subject to suit simply because they may be indemnified [by the licensee]").

▮ Massachusetts law allows an award of punitive damages in a wrongful death action

9. A number of cases implicitly affirming the Third Circuit's view had been handed down prior to the oral argument on defendants' motion, see *Day v. NLO, Inc.* 3 F.3d 153, 154 n. 1 (6th Cir.1993) ("The [1988] amendment[s were] not intended to alter the state law nature of the underlying tort claims."); *James v. Southern California Edison, et al.*, Case No. 94–1085–J (RBB) (S.D.Cal.1995), June 2, 1995 Order Ruling on Motions In Limine, at 4–5 ("The legislative history of the channeling provisions presented to the court indicate that the provisions relate to channeling payment of a judgment after there has been a finding of liability [against a third party supplier/vendor]"); *Tang v. Southern California Edison*, No. 93–1308–B (BTM) (S.D.Cal.1993), December 28, 1993 Order Denying Defendants' Motion For Summary Judgment Based On Compliance With The Applicable Federal Safety Regulations, at 3 ("Defendants' motion also asserts

that the state law of California is preempted by federal law because it is inconsistent with such law. However, ... defendants cite no controlling authority for this proposition nor do they demonstrate that compliance with the law of the State of California will be inconsistent with federal statutes, regulation or their purposes.").

10. *TMI IV* is a case remarkably similar to this one. The question of law addressed in the Third Circuit's opinion was:

[w]hether Pennsylvania's rules of decision relating to punitive damages are inconsistent with the provisions of the federal Price–Anderson Act, as amended, and therefore may not serve as rules of decision to be applied in a "public liability action" under the Price–Anderson Act.

*TMI IV*, 67 F.3d at 1122.

in a manner not "inconsistent with the provisions" of the Price–Anderson Act. M.G.L. c. 229, § 2,[11] the Wrongful Death Statute, authorizes punitive damages where a defendant's conduct is found to have been malicious, reckless, or grossly negligent.[12] Count IX of the Second Amended Complaint alleges that "Smith's death was the direct and proximate result of the defendant's negligence, breach of warranty, gross negligence, and malicious, willful, wanton, and reckless acts," and seeks punitive damages as a result. The basis of plaintiff's punitive damages claim is the allegation that GE knowingly and recklessly sold defective fuel rods to Boston Edison. While it is true that Price–Anderson will eventually require Boston Edison to indemnify GE for any damages, to dismiss GE at this stage as a party would hinder plaintiff from developing proof of knowing or reckless conduct on GE's part. The purpose of the Price–Anderson Act is to "provide persons seeking compensation for injuries as a result of a nuclear incident with significant advantages over procedures and standards for recovery that might otherwise be applicable under State tort law." S.Rep. No, 218, 100th Cong., 2d Sess. 4, reprinted in 1988 U.S.Code Cong. & Admin.News 1476, 1479. A limitation on provable damages is not an advantage to a plaintiff, nor does it serve to advance the public confidence-building objective of the Price–Anderson Act.

### ORDER

For the foregoing reasons, GE's motion for judgment on the pleadings is *DENIED*.[13]

SO ORDERED.

---

11. M.G.L. c. 229, § 2 provides that:

[a] person who (1) by his negligence causes the death of a person, or (2) by willful, wanton or reckless act causes the death of a person under such circumstances that the deceased could have recovered damages for personal injuries if his death had not resulted ... shall be liable in damages in the amount of: (1) the fair monetary value of the decedent to [his wife and children] ..., (2) the reasonable funeral and burial expenses of the decedent; (3) punitive damages in an amount of not less than five thousand dollars in such case as the decedent's death was caused by the malicious, willful, wanton or reckless conduct of the defendant or by the gross negligence of the defendant....

12. Where the defendant's acts rise only to the level of "ordinary" negligence, the statute limits a plaintiff's recovery to compensatory damages.

13. In so ruling, the court takes no position on the reasonableness of plaintiff's demands for discovery from GE.