# Babcock & Wilcox Co. v.
# American Nuclear Insurers

354

C.P. of Allegheny County, nos. GD99-11498 and GD99-16227.

*Neal R. Brendel,* for Babcock & Wilcox Co.
*Jon Hogue,* for American Nuclear Insurers.
*Leonard J. Marsico,* for Atlantic Richfield Co.

WETTICK JR., *J.,* April 25, 2001—There is pending litigation in the Federal District Court for the Western District of Pennsylvania in which more than 300 plaintiffs have raised claims against Babcock & Wilcox Company and Atlantic Richfield Company for harm attributable to exposure to radioactive materials emitted from two nuclear fuel processing facilities that B&W and ARCO owned and operated. In this underlying action (the *Hall* case), the total recovery may be several hundred million dollars. B&W and ARCO are insured by American Nuclear Insurers. B&W and ARCO contend that ANI policies which cover the underlying claims may provide total coverage of $320 million. ANI contends that most of the underlying claims are covered by ANI policy limits in effect prior to April 1974 when the total coverage never exceeded $40 million.

This consolidated action includes claims raised by the insurer and insureds for declaratory relief as to (1) when the liability of ANI is triggered and (2) whether the insurer must provide separate counsel to each insured to defend what the insurer characterizes as claims channeled to the licensee. Through paragraph 3 of an August 10, 2000 order which the parties submitted to me for my signature, the parties agreed that I would initially address only the following issues:

"(3) ARCO's preliminary objection in the actions is sustained in part and overruled in part without prejudice. Until further order of court, the actions shall proceed for the limited purpose of resolving the following legal issues (the issues for resolution):

"(a) Whether ANI, having acknowledged a duty to defend ARCO in the *Hall* action, is obligated to pay for supplemental and/or independent defense counsel to represent and defend ARCO's separate interests in the *Hall* action;

"(b) Whether ANI, having acknowledged a duty to defend B&W in the *Hall* action, is obligated to pay for supplemental and/or independent defense counsel to represent and defend B&W's separate interests in the *Hall* action;

"(c) With respect to the ANI facility form policies nos. NF-39, NF-83, MF-83, and MF-84, what is the applicable trigger and scope of coverage in connection with the *Hall* action.

"At this phase of the proceedings, the court shall not apply any rulings or determinations relating to the issues for resolution to the facts of any individual underlying claim. All other matters in the actions are hereby stayed until further order of court pending the resolution of the *Hall* action (the stay)."

In paragraphs 7-9 of the August 10, 2000 court order, the parties created a schedule for the filing and briefing of summary judgment motions. Plaintiffs and defendants have each filed motions for partial summary judgment in which they request favorable rulings concerning the issues set forth in paragraph 3 of my August 10, 2000 order. These motions for partial summary judgment are the subject of this opinion and order of court.[1]

These insurance coverage disputes involve insurance coverage for two nuclear fuel processing facilities: the Apollo facility and the Parks facility. In 1957, these facilities were licensed by the Atomic Energy Commission (later known as the Nuclear Regulatory Commission) to possess and use nuclear material. The facilities were owned by Nuclear Materials Equipment Co. (NUMEC) from 1957 to 1967. In 1967, ARCO formed a wholly owned subsidiary which acquired NUMEC. ARCO's subsidiary (also named NUMEC) operated these facilities until 1971 when it sold the stock in NUMEC to B&W. In connection with the sale, ARCO agreed to indemnify B&W and NUMEC and to assume certain liabilities of NUMEC. In 1974, B&W merged NUMEC into itself, thereby assuming NUMEC's liabilities.[2]

---

1. I have jurisdiction to hear the parties' requests for declaratory relief addressing insurance coverage because in each lawsuit each plaintiff in the underlying action has been named as an interested party and properly served. (It appears that counsel for the plaintiffs in the underlying action favor the resolution of the coverage issues in these proceedings.)

2. These facts are set forth in the parties' briefs. See ARCO's brief in support of motion for partial summary judgment at 4; ANI's brief in support of motion for partial summary judgment at 12-13; B&W's motion for partial summary judgment regarding ANI's obligation to pay independent defense counsel fees at 5-6.

Since March 1958, ANI (or its predecessor) has provided coverage for nuclear energy hazards at the Apollo facility to the licensee for the facility. The limit of liability for all incidents was initially $3 million. As of February 15, 1979, the limit was $160 million.

The following chart shows the increases in the limit for the Apollo facility:[3]

| Effective Date | NF-39 | MF-83 | Total |
|---|---|---|---|
| 03/04/58 | $3,000,000 | — | $3,000,000 |
| 09/24/60 | $5,000,000 | — | $5,000,000 |
| 07/12/68 | $10,000,000 | — | $10,000,000 |
| 11/30/71 | $20,000,000 | — | $20,000,000 |
| 03/07/75 | $96,875,000 | $28,125,000 | $125,000,000 |
| 03/16/77 | $108,500,000 | $31,500,000 | $140,000,000 |
| 02/15/79 | $124,000,000 | $36,000,000 | $160,000,000 |

ANI (or its predecessor) has also provided coverage for nuclear energy hazards for the Parks facility. The initial coverage was $3 million; as of February 15, 1979, coverage was increased to $160 million.

The underlying action arose out of a complaint filed in June 1994 against B&W and ARCO in the United States District for the Western District of Pennsylvania on behalf of five individuals and three purported class representatives. Plaintiffs raised claims against B&W and ARCO for bodily injury and property damage that were allegedly attributable to radioactive emissions from the Apollo and Parks facilities. Subsequently, 13 amended complaints have been filed, adding approximately 300 named plaintiffs, but not changing the operative averments of the original complaint. Plaintiffs in the underlying action are seeking hundreds of mil-

---

3. For this litigation, the break-out between NF-39 and MF-83 is irrelevant because the *Hall* litigation does not involve a single occurrence.

lions of dollars in compensatory and punitive damages. B&W and ARCO deny that the facilities released any radioactive or toxic materials into the environment that exceeded the levels permitted by federal regulation and deny that any of the plaintiffs' bodily injuries, diseases, and property damages are attributable to any releases from these facilities.

In 1998, eight "test cases" were tried in a single trial. The jury returned verdicts in favor of plaintiffs that totalled $33.7 million against B&W and ARCO and also $2.8 million against only B&W. The trial court later granted a new trial, based on evidentiary error, which has not occurred.

The two lawsuits that are the subject of this opinion and order of court were filed after the District Court granted B&W's and ARCO's post-trial motion to overturn the verdicts in the trial of the eight plaintiffs.

## I.

I first consider the applicable triggers with respect to ANI's policies.

The vast majority of the injuries in the underlying *Hall* case are various types of cancer. The plaintiffs in this underlying action allege that as a result of repeated releases of hazardous, toxic and/or radioactive substances into the area surrounding the Apollo and Parks facilities, they were repeatedly exposed to such substances. The repeated exposure caused the cancers.

While the parties have framed the issue in terms of whether the only triggering event is the date on which the exposure to the radiation caused the disease or whether exposure, progression, and manifestation are each triggering events, it appears that B&W and ARCO will obtain the coverage which they seek if manifesta-

tion is the triggering event. This is so because there is a single insurance policy for each facility and the limits of the insurance policies (which have increased over the years) are not cumulative from year to year. Consequently, if I agree with the position of B&W and ARCO that manifestation is a triggering event, I need not decide whether exposure and progression are also triggering events (and, thus, I need not address ANI's contention that a multiple-trigger theory applies only when a court must allocate liability among multiple single-year insurance policies issued by different insurance companies).[4]

For purposes of these motions for partial summary judgment, I will accept ANI's description of the biological process of radiation-induced cancer. See this opinion, *infra* at 361-64; transcript of February 7, 2001 argument at 20-21, 25-26. According to ANI's description, exposure to radiation does not necessarily cause cancer. A radiation-induced cancer begins when the nucleus of a cell receives a dose of radiation sufficient to alter its DNA such that it undergoes malignant transformation and becomes a cancer cell. There is a period of latency in which the cancer or tumor is growing undetected (cancer cells are doubling at a constant rate until enough of them have amassed such that they can be detected by modern medical techniques). The length of the latency period depends on the type of cancer. Latency periods may be 25 years or more.[5]

---

4. It is possible that this issue will need to be addressed subsequently if ANI's argument is correct that any payment made for a later period of coverage is deducted from the coverage available for earlier periods. However, this issue may not arise if the insureds initially submit claims covered only by the earliest periods.

5. Plaintiffs in the underlying litigation appear to offer slightly different expert testimony: every exposure increases the likelihood of a cell

ANI provides liability insurance only for nuclear energy hazards. Each policy that ANI has issued has remained in effect from the date on which it was issued to the present. The policies have been amended to change the name of the named insured and to increase policy limits. The policies do not have a term, and the liability limit is not cumulative from year to year. This means, for example, that if the limits of the policy for the Apollo facility described at pages 356-57 of this opinion had never been increased, the $3 million limit would be the total amount of insurance that would be available for all claims from the March 4, 1958 effective date to the present date.

It is the position of B&W and ARCO that the ANI policies should be read to provide coverage from the date of exposure to the date on which the cancer is diagnosed. If I read the ANI policies in this fashion, the Apollo policy, for example, would provide the following coverage for the following claims:[6]

Assume that plaintiffs A, B, C, D, E, F, and G moved to Apollo in June 1958. A was diagnosed with cancer in 1959; B was diagnosed with cancer in 1966; C was diagnosed with cancer in 1969; D was diagnosed with cancer in 1970; E was diagnosed with cancer in 1973; F was diagnosed with cancer in 1976; and G was diagnosed with cancer in 1980. Assume that a jury awarded each plaintiff $10 million based on a finding that the

---

becoming cancerous; each exposure is a substantial factor in the development of the disease; subsequent exposures are also substantial factors.

6. B&W and ARCO agree that this is the only coverage that would be provided. While ANI's brief states that B&W and ARCO assert that the highest limits ($160 million for each facility) apply for each claim, this is not the position that either insured asserted at the February 7, 2001 argument.

cancer was caused by the plaintiff's exposure to radioactive materials that the Apollo plant had emitted. Assume that the insured sought coverage for A's claim before B's claim, B's claim before C's claim, etc.

Under B&W's and ARCO's reading of the ANI policies, insurance coverage for A's verdict would be $3 million because throughout the period from 3/4/58 to 9/23/60, there is a $3 million limit; coverage for B's claim would be $2 million (*i.e.,* the new $5 million limit is not a new $5 million but only a new $2 million on top of the $3 million that has already been paid); the coverage for C's claim would be $5 million ($5 million of the $10 million limit has already been paid); the coverage for D's claim would be $0 (the entire $10 million has already been paid); the coverage for E's claim would be the full $10 million (*i.e.,* as of 11/30/71, there is a new $10 million for the period from 11/30/71 through 3/6/75); the coverage for F's claim would be $10 million because there is a new $105 million; and the coverage for G's claim would be $10 million (because of these previous payments totaling $40 million, there was a balance of $120 million for persons who are diagnosed with cancer on or after 2/15/79).[7]

According to B&W and ARCO, the cancer of most of the plaintiffs in the underlying litigation did not become detectable until after 2/15/79. Consequently, the coverage for most of the claims will be $160 million less prior payments.

ANI contends that its policies do not provide the coverage described in examples A-G because the applicable trigger under its policies is not the date on which the cancer can be diagnosed. Instead, it is the date on which

---

7. These examples do not take into consideration any money that would be deducted from the limits for costs of defense.

exposure to nuclear material caused the cancer (*i.e.,* the date on which a cell's DNA underwent malignant transformation and cancer began). ANI refers to the use of this date as a causation trigger and to the date on which the cancer can be diagnosed as a diagnosis trigger.

ANI believes that large numbers of the plaintiffs in the underlying *Hall* lawsuit will be covered by examples A-E because of the lengthy latency period for many cancers caused by radiation.

ANI contends that the date of causation is required by its insurance policies and can be established by medical science. In its brief, ANI refers to the research of Dr. Ann Kennedy, an expert witness who will testify on its behalf as follows:

"(B) *The causation trigger required by the facility form policies is also one which is recognized by medical science*

"Not only is causation the operative fact for the coverage analysis, it is also a fact which can be established by medical science. The vast majority of the injuries alleged by the *Hall* plaintiffs are cancers. While radiation-induced cancer is characterized by its 'potentially unlimited and uncontrolled growth,' Kennedy aff. at ¶3, there is nevertheless a definitive point in the biological process when the cancer is 'caused.' Dr. Ann Kennedy, who has spent over 30 years studying cancer and particularly cancers caused by radiation,[14] explains that 'a radiation induced cancer begins when the nucleus of a cell receives a dose of radiation sufficient to alter its DNA such that it undergoes malignant transformation and becomes a cancer cell.' *Id.* at ¶17. While there are several steps in the development of the malignancy, '[o]ne of these steps is the initial step, or the initiation step, directly produced by the radiation exposure.' *Id.*

at ¶19. After the initiated cell undergoes further changes to become fully malignant, the cell must reproduce itself until it results in a 'mass of cells . . . large enough to be detected and diagnosed as a cancer.' *Id.* at ¶17.

"The distinction between causation and diagnosis is particularly important for purposes of construing the trigger of the facility form policies because '[n]ormally, between the initial abnormal cell produced by radiation and the time of diagnosis of a cancer, years of time pass.' *Id.* at ¶19. During those years, the cancer cells are doubling at a constant rate until enough of them have amassed such that they can be detected by modern medical techniques. *Id.* at ¶17. This 'latency period' when the cancer is growing undetected in the body can span many years; in fact, 'latency periods of 25 years or more have been observed for many types of radiation-induced cancer.' *Id.* at ¶20. The 'cause' language in the facility form policies mandates that coverage is triggered at the beginning of the latency period and not at the end; the ultimately diagnosed cancer was 'caused' when the radiation exposure produced the initiated cell. As Dr. Kennedy explains:

" 'While it may take a decade or more in some cases for the abnormal/cancer cells to replicate enough times so that a cancer becomes detectable or the person suffers the effects of injury or disease, the ultimately diagnosed mass of cancer cells is the direct result of the replication of the original cell that was made abnormal by a sufficient dose of radiation.' *Id.* at ¶19.

"Another example from the list of *Hall* plaintiffs highlights the distinction between a 'causation trigger' and a 'diagnosis trigger.' The estate of Anthony F. Venis alleges that his kidney cancer diagnosed in 1973 was

caused by emissions from the Apollo facility. See Keely aff. exhibit 32 (injury chart) at 31. If the latency period for Mr. Venis' cancer was very short, for example less than a year, the $20,000,000 limit that became effective November 30, 1971 would apply to his claim. If it were slightly longer, for example three years so that his injury was caused in 1970, the $10,000,000 limit effective on July 12, 1968 would apply to his claim. If the latency period were six years such that his injury was caused in 1967, the $5,000,000 limit effective on September 24, 1960 would apply. Thus, even for this one plaintiff, the latency period for his injury will determine whether the applicable limit triggered is $5 million, $10 million or $20 million.[15]

———

"14. Dr. Kennedy is an expert in the area of radiation biology, having taken a doctorate degree in that field from Harvard University. She has taught in the Department of Cancer Biology at the Harvard School of Public Health and is currently professor of radiation biology at the University of Pennsylvania School of Medicine. She has authored scores of peer-reviewed articles on radiation-induced cancer. Kennedy aff. at ¶1.

"15. Medical science can determine the latency period for numerous types of cancer to a reasonable degree of certainty. Following a declaration of the proper construction of the policy language in this phase of the coverage action, the Pools intend in a future phase to offer evidence with respect to such latency periods so that the applicable limits can be determined with respect to individual *Hall* plaintiffs."

The ANI policies contain the following language: [ANI agrees]

"I. Coverage A—Bodily Injury And Property Damage Liability to pay on behalf of the insured: (1) all sums which the insured shall become legally obligated to pay as damages because of bodily injury . . . caused by the nuclear energy hazard . . . .

"III. Definitions—Wherever used in this policy:

"*'bodily injury'* means bodily injury, sickness or disease, including death resulting therefrom, sustained by any person . . . .

"*'nuclear energy hazard'* means the radioactive, toxic, explosive or other hazardous properties of nuclear material, but only if (1) the nuclear material is at the facility or has been discharged or dispersed therefrom without intent to relinquish possession or custody thereof to any person or organization . . . .

"IV. Application Of Policy—This policy applies only to bodily injury or property damage (1) which is caused during the policy period by the nuclear energy hazard and (2) which is discovered and for which written claim is made against the insured, not later than two years after the end of the policy period." (Keely aff. exhibit 1 at 1.)

The endorsements which increase the policies' limits contain similar language:

"This amended limit applies with respect to obligations assumed or expenses incurred because of bodily injury or property damage caused, during the period from the effective date of this endorsement to the date of termination of the policy, by the nuclear energy hazard." (Keely aff. exhibit 4 at 1.)

B&W and ARCO contend that they are protected by the policy limits in effect on the date on which the cancer could be diagnosed. They rely on *J.H. France Re-*

*fractories Company v. Allstate,* 534 Pa. 29, 626 A.2d 502 (1993).

Between 1956 and 1972, J.H. France and its wholly owned subsidiary manufactured and marketed a product containing asbestos. In the period beginning April 1979 and continuing beyond 1984, numerous individuals who allegedly suffered from asbestos-related diseases contracted through exposure to J.H. France's products, filed lawsuits against J.H. France. The initial lawsuit involved a decedent who allegedly suffered from asbestos-related diseases contracted through exposure to J.H. France's products from 1948 through 1978.

J.H. France was insured by six insurance companies for the period from 1967 into the 1980s. The insurance companies and J.H. France instituted declaratory judgment actions which addressed the insurer's duty to defend and to indemnify.

The six insurers provided comprehensive insurance coverage to J.H. France from July 1, 1967 through October 30, 1984. The policies (standard comprehensive general liability "CGL" policies) contained the following language:

"[The insurer] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury . . . to which this insurance applies, caused by an occurrence, and [the insurer] shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury . . . .

" 'Bodily injury' means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom . . . .

" 'Occurrence' means an accident, including continuous or repeated exposure to conditions, which result in bodily injury . . . neither expected nor intended from the standpoint of the insured." *Id.* at 35, 626 A.2d at 505.

The parties stipulated that the evidence in the underlying action included medical evidence that the nature of asbestos-related diseases is progressive. Discrete cellular injuries occur upon exposure to asbestos; the disease may then progress and culminate in the manifestation of recognizable incapacitation.

The Supreme Court ruled that under the language of the policies, coverage is provided if any of the three events—exposure, progression, or manifestation—occurred during the term of the policy. The court relied on the definitions of "occurrence" and "bodily injury." The policy provided coverage for damages incurred because of bodily injury caused by an occurrence. Bodily injury includes any injury which occurs during the policy period. The court ruled that any stage of the development of a claimant's disease constitutes a bodily injury occurring during the policy period:

"Rather than selecting one or another of the phases as the exclusive trigger of liability, it seems more accurate to regard all stages of the disease process as bodily injury sufficient to trigger the insurers' obligation to indemnify, as all phrases independently meet the policy definition of bodily injury." *Id.* at 38, 626 A.2d at 507.

The court also ruled that every insurer which was on the risk at any time during the development of the claimant's asbestos-related disease had an obligation to indemnify J.H. France. The opinion stated that the definition of an "occurrence" supported the court's posi-

tion that the liability of each insurer was triggered if exposure, progression or manifestation occurred during the term of the policy.

"The definition suggests that any insurance policy triggered under the 'multiple-trigger' concept with respect to any specific claim is potentially liable for the entire amount of any judgment or settlement of that claim. An 'occurrence' includes 'continuous or repeated exposure to conditions which result in bodily injury.' The insurers which drafted the definition obviously contemplated the possibility of injury resulting from continuous or repeated exposure to conditions, and specified that the process of exposure was to constitute one occurrence. If prolonged exposure, constituting one occurrence, resulted in injury, and if the injury occurred during the time a given policy was in effect, then the injury is an insurable risk under the terms of that policy." *Id.* at 40-41, 626 A.2d at 508.

ANI contends that *J.H. France* does not apply because the ANI policies are not "occurrence" policies; they are "causation" policies uniquely designed for the nuclear industry.

According to ANI's expert witness (see *supra* at 362) a radiation-induced cancer begins when the nucleus of a cell receives a dose of radiation sufficient to alter its DNA such that it undergoes malignant transformation and becomes a cancer cell. Thereafter, the initiated cell undergoes further changes to become fully malignant; the cell reproduces itself until it results in a mass of cells large enough to be detected and diagnosed as cancer. It is ANI's position that its "causation" policy mandates that coverage is triggered at the beginning of

the latency (*i.e.,* when the radiation exposure results in the initial abnormal cell).[8]

ANI supports its position that this is a "causation" policy on the basis of provisions within the policy which state that it applies only to bodily injury or property damage which "is caused during the policy period by the nuclear energy hazard" and the language in endorsements increasing the policy limits which states that the amended limits apply only to obligations or expenses incurred "because of bodily injury or property damage caused, during the period from the effective date of this endorsement to the date of termination of the policy, by the nuclear energy hazard." According to ANI, CGL occurrence policies focus on the date of an injury while its "causation" policies focus on the date when the emission causes the injury.

B&W and ARCO contend that the language of the ANI policies is almost identical to the language of the *J.H. France* CGL policies, so *J.H. France's* interpretation of the CGL policies governs the ANI policies. I agree.

Both the ANI and CGL policies cover only bodily injury and property damage. Under a CGL policy, *bodily injury* "means bodily injury, sickness or disease sustained by any person;" under an ANI policy—*bodily injury* is defined as "bodily injury, sickness or disease including death resulting therefrom, sustained by any person." Obviously, the ANI policy definition of bodily injury contains no language that would support an interpretation that differs from *J.H. France's* interpretation of a CGL policy.

A CGL policy provides coverage "because of *bodily injury* . . . to which this insurance applies, *caused by* an

---

8. ANI is not seeking an emission trigger because an emission does not necessarily cause cancer. ANI's reply memorandum at 2-3, 18-19.

occurrence." (emphasis added) An ANI policy provides coverage "only to *bodily injury . . . which is caused* during the policy period *by* the nuclear energy hazard." (emphasis added) There are no differences in the language of an ANI policy that would support a different interpretation from *J.H. France's* interpretation of the CGL policy unless there is language in the definitions of "nuclear energy hazard" and "occurrence" that support a different interpretation. However, the only differences relate to the scope of coverage. The CGL policy covers bodily injury from any accident; the ANI policy covers bodily injury only from nuclear material.[9]

I recognize that the CGL policy states that it covers only bodily injury which occurs during the policy period by using the clause "which occurs during the policy period" in the definition of bodily injury, and that the ANI policy states that it covers only bodily injury which occurs during the policy period in the application of coverage by saying that the policy covers only bodily injury "which is caused during the policy period."

ANI's emphasis on the language in the CGL policy's definition of *bodily injury* ignores other language in the CGL policy that uses the same causation language on which ANI relies. As I stated, the CGL policy provides coverage "because of bodily injury . . . to which this insurance applies, *caused* by an occurrence." An *occurrence* is defined as bodily injury resulting from

---

9. There is no merit to ANI's argument that the following clause in the definition of nuclear energy hazard creates a difference in the coverage language between ANI and CGL policies: coverage only if the nuclear material "has been *discharged* or *dispersed* therefrom without the intent to relinquish possession or custody thereof . . . ." (emphasis added) The purpose of this clause is to exclude from coverage discharges and disbursements where there was an intent to relinquish possession or custody of nuclear material.

any accident. A *bodily injury* is defined as an injury which occurs during the policy period. Thus, the CGL policy provides coverage "because of [an injury which occurs during the policy period] to which this insurance applies, caused by ~~occurrence~~ [any accident]." This coverage is no different from the coverage furnished by the ANI policy which applies "only to bodily injury [defined as bodily injury, sickness or disease sustained by any person] which is caused during the policy period by the nuclear energy hazard."

In summary, both the CGL policies and the ANI policies use the same "causation" language. The present case involves the development of diseases that, for purposes of coverage issues, is similar to the development of asbestos-related diseases. Consequently, *J.H. France's* interpretation of the CGL policies governs this litigation.

Also, see *Consulting Engineers Inc. v. Insurance Company of North America,* 710 A.2d 82 (Pa. Super. 1998), where the court ruled that any insurance policy that specifically focuses on the act causing injury as the coverage trigger and specifically requires this injury to occur during the applicable policy period is an "occurrence" policy governed by Pennsylvania case law construing occurrence policies.

Since Pennsylvania case law will characterize the ANI policies as occurrence policies, manifestation is a triggering event. Under Pennsylvania case law an occurrence, for purpose of determining insurance coverage, happens when the injurious effects of the negligence first manifest themselves in such a way that would put a reasonable person on notice of the injury. *Consulting Engineers Inc. v. Insurance Company of North America,* 710 A.2d 82, 85 (Pa. Super. 1998); *D'Auria*

*v. Zurich Insurance Co.,* 352 Pa. Super. 231, 239, 507 A.2d 857, 861 (1986). Also, ANI does not cite any Pennsylvania appellate court case law that has ever used as the sole triggering event an injury-in-fact theory under which the triggering event is the time in which some injury, which cannot be detected, occurred within the human body.

Words of an insurance policy should be given their every day meaning; they must be construed in a natural, plain, and ordinary manner. *Consulting Engineers Inc. v. Insurance Company of North America, supra,* 710 A.2d at 85. *Riccio v. American Republic Insurance Co.,* 550 Pa. 254, 263-64, 705 A.2d 422, 426 (1997). Under the plain meaning, a bodily injury which is caused during the policy period refers to a diagnosable injury or disease arising during the policy period. When the ANI policies were issued for the Apollo and Parks facilities (Apollo—1958; Parks—1960), the insurers and insureds would have intended to provide coverage based on the date that the injury/disease was capable of being detected.

Also, if there is any ambiguity, the policy must be construed in favor of the insured and against the insurer. *Id.* When the insureds obtained higher policy limits, in the absence of clear language in the policy to the contrary, they would have reasonably expected that the increased coverage applied to claims of any person who was initially diagnosed with a disease after the date on which the limits were increased. They would not have construed the policy to exclude from the increased coverage the claims of every person who, as of the date of the increased coverage, had an undetectable injury to even a single cell of his or her body. Also, they would not have anticipated that the scope of their insurance

protection would depend on future theories of medical science regarding the development of diseases caused by exposure to radiation.

It is possible that a CGL policy need not describe with specificity every circumstance in which coverage is not provided because every circumstance cannot be anticipated. However, the ANI policies covered only injuries/diseases caused by nuclear material.[10] Consequently, ANI was in a position to describe with specificity any exclusions. Thus, if ANI intended to exclude persons who did not have any detectable diseases caused by exposure to radiation as of the date of the increase of the policy limits, it was required to include specific language advising the insured that coverage was not based on the date on which a person previously exposed to radiation developed a detectable injury or disease but, instead, excluded any person who already had even a single cell that was cancerous because of exposure to radiation.

If this is what ANI intended, it would have been easy for ANI to state that the new limits did not apply after the beginning of the latency period and to define this term. For example, ANI's endorsements (Keely aff. exhibit 4) clearly describe the manner in which the amended limit of liability operates (the insurance is not cumulative, and each payment shall reduce limits of liability previously stated as well as the current amended limit).

For these reasons I rule that manifestation is an applicable trigger.

---

10. In its reply memorandum of law in support of motion for partial summary judgment at 4, ANI states that unlike comprehensive general liability policies, ANI policies were written specifically to cover legal liability for damages caused solely by nuclear energy hazards at nuclear facilities.

## II.

I next consider whether ANI's duty to provide a defense is met by selecting a single law firm to defend the claims that the plaintiffs have raised against B&W and ARCO in the underlying action.

B&W and ARCO contend that they require separate counsel because they disagree over which defendant is ultimately responsible for claims that are not covered by insurance. It is the position of B&W that ARCO is legally responsible to the plaintiffs in the underlying litigation and to B&W (through indemnification) for any recoveries based on discharges that occurred when ARCO was the licensee.[11] In support of its position that ARCO is legally responsible to the plaintiffs in the underlying litigation and to B&W for these discharges, B&W relies on the following: an interpretation of the Price Anderson Act with which ARCO disagrees; an indemnification agreement under which ARCO allegedly agreed to hold B&W harmless for all liability it incurs because of the actions of the prior licensee; and common-law indemnification under which a defendant against whom a judgment is entered may seek indemnification from any other entity whose negligence, solely or jointly, caused the injuries to the plaintiffs in the underlying action.

ANI contends that there is not and cannot be a material conflict between B&W and ARCO because any traditional tort and indemnity doctrines that would create conflicts between B&W and ARCO do not apply to the

---

11. In the underlying *Hall* litigation, the trial court has ruled that ARCO is liable for claims that could be raised against the ARCO subsidiary (NUMEC) that held the license.

underlying federal litigation. Its argument is set forth in its brief in support of motion for partial summary judgment at 2-3:

"With respect to the first issue for resolution, B&W and ARCO are neither entitled to nor do they require independent counsel to represent them separately. The *Hall* action was brought as a 'public liability action' pursuant to the federal Price Anderson Act, 42 U.S.C. §2210 et seq. The Act provides that, regardless of who may be named as defendants, all financial responsibility for liability in a public liability action shall be channeled to the party that holds the license for the nuclear facility from the Nuclear Regulatory Commission. In accordance with this 'economic' channeling provision of the Price Anderson Act, the facility form policies contain an omnibus insured provision that defines the 'insured' as both the named insured and 'any other person or organization with respect to his legal responsibility for damages because of bodily injury or property damage caused by the nuclear energy hazard.'

"Regardless of how many entities are named as defendants in a public liability action, the Price Anderson Act channels responsibility for payment of all defendants' liability to the licensee of the facility. By design, material conflicts of interest, therefore, cannot arise among defendants in a public liability action because the law pursuant to which the action is brought settles the question of allocation. For this reason, a single law firm represents all defendants in a public liability action. And for the same reason, cross-claims in public liability actions are not permitted; litigating cross-claims would waste resources and frustrate the intent of the Price Anderson Act to streamline the litigation

process in order to promptly and efficiently compensate victims of nuclear accidents." [12]

It is the position of B&W that ANI's interpretation of the Price Anderson Act is incorrect.[13] Thus, an attorney representing B&W in the federal court action must be

12. ANI does not contend that Price Anderson limits the plaintiffs' recovery against a licensee to that amount of mandated insurance coverage plus other financial protections provided for under the Price Anderson Act. See *e.g.,* ANI's reply memorandum at 6 n.3 (Price Anderson "says that the licensee has the responsibility to satisfy any judgment to the plaintiffs (initially out of the financial protection).").

Also, while ANI contends that the licensee "bears the responsibility for bearing all liability to the plaintiff in the first instance" (*id.* at 6), ANI does not contend that B&W cannot in separate proceedings seek to recover payments made to the plaintiffs. See ANI reply memorandum of law in support of motion for partial summary judgment at 2 ("Issues of allocating liability among co-defendants are deferred to a later contribution action among those parties only when it is determined that there is legal liability resulting from a nuclear incident *that cannot be satisfied by financial protection available to the licensee.*") *id.* at 11(emphasis added); ("B&W would like to claim in the *Hall* action that ARCO is responsible for paying some or all of any damages in the action as a result of the assumption agreement entered into by ARCO at the time B&W purchased the stock of NUMEC. . . . While these facts would support the assertion of contribution claims by B&W and ARCO against each other in some forum, they do not establish that such claims may be asserted by B&W and ARCO in the *Hall* action."). Also, see ANI reply memorandum at 7 n.4 (ANI's "position is actually that Price Anderson eliminates contractual risk shifting among co-defendants *during the public liability action.* . . . As they have previously stated, any contractual risk shifting must take place after resolution of the public liability action in a separate contribution proceeding."). (emphasis in original)

13. See B&W's brief in opposition to ANI's motion for partial summary judgment at 2: "For all of ANI's emphasis that Price Anderson supposedly 'channels' all liability to B&W, the Act never states any such thing. It certainly does not state that B&W must bear responsibility for injuries properly attributable to ARCO's conduct or that B&W's contractual rights to indemnification and/or contribution have been vaporized by the Act."

prepared to argue that: (1) only ARCO is liable for cancers that were diagnosed before B&W acquired the facilities; (2) ARCO is jointly liable where a jury finds that both B&W and ARCO contributed to a cancer; and (3) B&W may raise its indemnity claims in the federal court lawsuit.

These are not arguments that an attorney representing ARCO may raise because ARCO agrees with ANI's position that Price Anderson channels any liability to B&W. ARCO also contends that if this is the correct interpretation of the Price Anderson Act, ARCO should not be in the underlying case at all. Consequently, an attorney representing ARCO must be prepared to raise the arguments that may result in ARCO's dismissal from the federal court action.

In the *Hall* case, the jury awarded verdicts in the amount of $33.7 million against B&W and ARCO. B&W characterizes the verdicts as findings of joint and several liability. ANI disagrees. According to ANI, pursuant to the provisions of the Price Anderson Act, the trial judge (if the verdicts had not been set aside) should have molded the verdicts by entering judgments in the plaintiffs' favor against only B&W.

Assuming that the verdicts had not been set aside, a law firm representing both B&W and ARCO could not have argued that the verdicts should be molded by entering judgments only against B&W because B&W disagrees with this interpretation of the Price Anderson Act. Neither could the law firm have argued that judgments should be entered against both defendants because ARCO supports ANI's interpretation of the Price Anderson Act.[14]

---

14. Also, even if ANI's interpretation of the Price Anderson Act is correct, there is the additional issue of whether the verdicts should be

In the complaints filed in the underlying federal lawsuit, plaintiffs seek judgments against each B&W and ARCO, jointly and severally. I assume that counsel for the plaintiffs (particularly because of ANI's interpretation of the coverage provisions of its insurance policies and B&W's bankruptcy) will contend in the federal court proceedings that any verdict against B&W and ARCO should be reduced to a judgment in which each is jointly and severally liable. If B&W and ARCO are represented by the same law firm, this law firm will be receiving conflicting directions from its two clients as to how to respond to this argument of the underlying plaintiffs.

The first three questions on the verdict slip in the underlying test case asked the jury to consider separately the plaintiffs' claims against each defendant:

### "VERDICT

(1) Do you find that the defendants listed below were negligent by violating 10 C.F.R. §20.105?

|  | YES | NO |
|---|---|---|
| Atlantic Richfield Company | ✓ | __ |
| Babcock & Wilcox Company | ✓ | __ |

(2) Do you find that the defendants listed below were negligent by violating 10 C.F.R. §20.106?

|  | YES | NO |
|---|---|---|
| Atlantic Richfield Company | ✓ | __ |
| Babcock & Wilcox Company | ✓ | __ |

[If your answer to either question for either defendant was 'Yes,' proceed to question 3 as to that defendant or defendants. If your answer was 'No' to both ques-

---

molded in order to address jury findings against ARCO that may be relevant in a separate indemnity action.

tions as to both defendants, do not answer any other questions, sign the verdict slip and return to the courtroom.]

(3) Was the negligence of either or both defendants a cause in fact and a substantial factor in bringing about the harm to

|  | ARCO | | B&W | |
| --- | :---: | :---: | :---: | :---: |
|  | Yes | No | Yes | No |
| Tina Hall | ✓ | — | ✓ | — |
| Kevin Barr | ✓ | — | ✓ | — |
| Jennifer Marks Kettering | — | X | ✓ | — |
| Anna Mae Chrusick | ✓ | — | ✓ | — |
| Edmond Kolakowski | ✓ | — | ✓ | — |
| Grace Cimprich | ✓ | — | ✓ | — |
| Helen Mitcheson | ✓ | — | ✓ | — |
| Susan Visely | ✓ | — | ✓ | — |

[If your answer was 'Yes' as to either defendant for any individual plaintiff, please proceed and answer the following questions as to those plaintiffs.]"

I agree with ARCO that it cannot assume that the sole issue the trial court judge was considering was whether the plaintiffs may obtain a judgment against B&W. If only B&W is liable for the negligence of either B&W or ARCO, the verdict slip would not have broken out the plaintiffs' claims against ARCO and the plaintiffs' claims against B&W (thereby creating a potential conflict between B&W and ARCO). The jury, instead, would only have been asked whether ARCO and/or B&W were negligent by violating the applicable regulations, and whether this negligence was a substantial factor in bringing about the harm to the plaintiffs.[14a]

_____
14a. The verdict slip would have read as follows: (1) Do you find that either or both of the defendants were negligent by violating 10

Even assuming that ANI's contention that cross-claims cannot be raised in the underlying federal action is correct, the law may permit B&W to seek common-law contribution from ARCO where its negligence solely or partially contributed to the injuries of the plaintiffs in the underlying case. Furthermore, under the written indemnification agreement between B&W and ARCO, ARCO's duty to indemnify may depend on whether its negligence solely or partially contributed to the plaintiffs' injuries. The verdict slips used in the federal action contain findings as to whether ARCO's negligence was a substantial factor in bringing about harm to the plaintiff. In all likelihood, findings that only ARCO's negligence was a substantial factor in bringing about this harm, and findings that the negligence of both defendants was a substantial factor in bringing about this harm, will apply to subsequent B&W-ARCO indemnity litigation. Consequently, in the pending federal litigation, a law firm representing ARCO's interests might attempt to convince a jury that as to each plaintiff ARCO was not negligent or that its negligence was not a substantial factor, while an attorney representing B&W might attempt to convince a jury that if discharges from the facility caused a plaintiff's injuries, ARCO is solely or jointly responsible for the injuries. The plaintiffs' lawyers in the underlying litigation will, in all likelihood, be seeking to convince the jury that the negligence of both defendants caused the injuries whenever the exposure occurred during periods before and after B&W

---

C.F.R. §20.10? Yes ___ No ___; (2) Do you find that either or both of the defendants were negligent by violating 10 C.F.R. §20.1067? Yes ___ No ___; and (3) If your answer to either question was *yes,* was the negligence a cause in fact and a substantial factor in bringing about harm to plaintiff? Yes ___ No ___.

became the licensee. A lawyer representing both B&W and ARCO can only ask the jury to find that neither defendant caused the injuries. He or she cannot suggest that responsibility rests with only one defendant (or alternatively, that it rests with both defendants) in the event the jury finds that discharges from the facility caused a plaintiff's injuries.

ARCO asks the following question: "If the plaintiffs can't recover against me and if this litigation can't, in any way, affect any indemnification claims that B&W seeks to raise against me, why am I still in the case?" ANI does not have a convincing response. ANI simply states: "While a plaintiff in a public liability action may name defendants other than the licensee for any number of reasons—for example, to obtain party discovery from the non-licensee—the channeling provision will nonetheless 'shift [ ] the obligation to pay damages to [the licensee].' *Smith v. General Electric Co.,* 938 F. Supp. 70, 77 (D. Mass. 1996)." ANI's reply memorandum at 6. (footnote omitted)

If ARCO is simply a nominal defendant, ARCO's interests would differ from the interests of a defendant against whom a judgment can be entered. Consequently, it is unclear why ANI would not have appointed separate counsel to represent ARCO in its capacity as a nominal defendant.

It is ANI's position that the defense of the plaintiffs' claims in the underlying lawsuit is time consuming and expensive; consequently, it should not be paying a second law firm to prepare for and to present a defense to the plaintiffs' claims. However, if (as ANI contends) it is clear that the outcome of the underlying lawsuit cannot include the entry of a judgment against ARCO or any findings detrimental to ARCO that could be intro-

duced in subsequent litigation between B&W and ARCO, the second law firm representing ARCO's nominal interests would not be preparing and presenting a defense to the underlying claims.[15]

I did not begin my discussion of ANI's duty to provide separate counsel by reviewing the case law on which ANI relies to support its "channeling" interpretation of Price Anderson because I agree with B&W and ARCO that it does not matter whether I agree or disagree with ANI's interpretation of this federal legislation. Obviously, the trial court and appellate courts deciding the underlying federal action are not required to give any weight to my interpretation of the Price Anderson Act.

Plaintiffs in the underlying action are seeking judgments against both B&W and ARCO; there is no ruling stating that they may obtain judgments only against B&W. B&W wishes to raise cross-claims in the underlying action; there is no final ruling precluding them from doing so. Case law holds that the scope of the duty to provide a defense is defined by the claims raised in the pleadings in the absence of a court ruling limiting these claims. *Scopel v. Donegal Mutual Insurance Co.,* 698 A.2d 602 (Pa. Super. 1997). Consequently, in deciding whether ANI has a duty to provide separate counsel, I must assume that the claims which plaintiffs raise against ARCO in the underlying action can result in judgments in favor of plaintiffs against ARCO and that jury findings can be used in subsequent litigation between

---

15. ANI is obligated to pay only for counsel fees that are reasonably incurred. Consequently, if the law is clear that ARCO is only a nominal defendant, ANI would not be required to pay any counsel fees ARCO incurred in defending the claim that ARCO was negligent and that its negligence contributed to a plaintiff's injuries.

B&W and ARCO.[17][sic] Thus, at this stage of the proceedings, one law firm may not represent both defendants because of the conflicts that I have described.

After considering the case law which ANI cites in support of its channeling theory, I continue to agree with B&W and ARCO that the law is not settled and there is a reasonable likelihood that, at least where both defendants were licensees, the courts may reject ANI's channeling theory and ANI's argument that cross-claims cannot be raised.

ANI cites the following statement in an opinion of the United States Court of Appeals for the Third Circuit: "A claim growing out of any nuclear incident is compensable under the terms of the [Act] or it *is not compensable at all." In re TMI Litigation Cases Consolidated II,* 940 F.2d 832, 854 (3d Cir. 1991). However, this statement does not answer the question of whether under the terms of the Price Anderson Act, ARCO may be liable for incidents occurring when it was a licensee, whether cross-claims may be asserted, and whether a trial in a public liability action may result in findings of fact that may be relevant to subsequent indemnification claims (assuming that these claims can be raised).

ANI cites four other cases in support of its interpretation of Price Anderson: *Smith v. General Electric Co.,* 938 F. Supp. 70 (D. Mass. 1996); *Corcoran v. New York Power Authority,* 935 F. Supp. 376 (S.D.N.Y. 1996), *aff'd,* 202 F.3d 530 (2d Cir. 1999); *Grimes v. Baltimore Gas and Electric Co.,* 1995 WL 901885 (D. Md. 1995); and *O'Conner v. Commonwealth Edison Co.,*

---

17. [sic] Also, B&W may be permitted to pursue its cross-claims in the underlying action because these claims were dismissed only on procedural grounds.

807 F. Supp. 1376 (C.D. Ill. 1992), *aff'd,* 13 F.3d 1090 (7th Cir. 1994).

In *O'Conner v. Commonwealth Edison Co., supra,* the district court considered motions by the defendants to exclude part of the testimony of plaintiff's causation expert and for summary judgment based on the evidence then remaining in the case. The court granted both motions and dismissed the action.

The defendants in *O'Conner* included both the licensee and a contractor at the plant. In dicta, the court said that Congress had channeled all public liability to licensees and away from nonlicensees such as contractors who might have otherwise born liability under ordinary tort law. The court stated that only one law firm has represented both defendants since the contractor cannot be separately liable to the plaintiff in any manner in this case:

"One law firm has represented both defendants, without conflict, throughout the pendency of this action, since there can be only one liability pursuant to Price Anderson and that liability is channeled solely through the licensee and through the financial protection provided by Price Anderson. Any disagreements between defendants as to who might have done what wrong are irrelevant to O'Conner's claim for compensation under Price Anderson. The only relevant issues are whether the duty owed was breached (O'Conner's exposure), and whether that exposure caused his claimed injury (causation)." 807 F. Supp. at 1378.

*Grimes v. Baltimore Gas and Electric Co., supra,* is a one-page memorandum opinion in which the court was considering "an unopposed motion to dismiss filed by several of the defendants." In this memorandum opinion, the court said that claims against the nonlicensee

defendants should be dismissed because Congress sought to eliminate complicated legal proceedings that might arise in multiple defendant suits, so it channeled all public liability to licensees and away from non-licensees such as contractors.

In *Corcoran v. New York Power Authority, supra,* the estate of a person who died allegedly because of exposure to radiation sued both the licensee and Westinghouse which provided maintenance services. Westinghouse argued that the Price Anderson Act channeled all public liability to the licensee so Westinghouse was not a proper party. Westinghouse relied on the *Grimes* case which cites the *O'Conner* case. The court found Westinghouse's argument to be "unpersuasive." 935 F. Supp. at 390. It stated that in *O'Conner* the contractor was not dismissed from the case and that "it is incongruous to argue that contractors cannot be subject to suit *simply because they may be indemnified.*" *Id.* (emphasis added)

In *Smith v. General Electric Co., supra,* the estate of an electrician who worked at a nuclear power plant and contracted leukemia sued the owner of the plant and General Electric, the supplier of fuel rods. General Electric sought dismissal on the ground that it was a redundant party. General Electric argued that the channeling provisions of the Price Anderson Act affirmatively barred the plaintiff from even naming General Electric as a party. While the court denied the motion, in its opinion it stated that "[t]he purpose of the channeling provision of the Price Anderson Act is to make third-party vendors like GE indemnitees of nuclear plant operators like Boston Edison. The Act does not exonerate GE of its legal *liability,* it merely shifts the ob-

ligation to pay *damages* to Boston Edison." 938 F. Supp. at 77.

The plaintiffs' claims against General Electric included claims for punitive damages based on allegations that General Electric knowingly and recklessly sold defective fuel rods to Boston Edison. The opinion cited, with approval, a ruling of the Third Circuit that a claim for punitive damages may be asserted directly against a defendant who supplied the materials or services to a nuclear plant, so long as such award is authorized by the law of the forum state.[18] The *Smith* opinion contained the following language:[19]

"The basis of plaintiff's punitive damages claim is the allegation that GE knowingly and recklessly sold defective fuel rods to Boston Edison. While it is true that Price Anderson will eventually require Boston Edison to indemnify GE for any damages, to dismiss GE at this stage as a party would hinder plaintiff from developing proof of knowing and reckless conduct on GE's part. The purpose of the Price Anderson Act is to 'provide persons seeking compensation for injuries as a result of a nuclear incident with significant advantages over procedures and standards for recovery that might otherwise be applicable under state tort law.' A limitation on provable damages is not an advantage to a plaintiff, nor does it serve to advance the public confidence-building objective of the Price Anderson Act." 938 F. Supp. at 78. (citation omitted)

---

18. *In re TMI [IV]*, 67 F.3d 1103 (3d Cir. 1995).

19. The *Smith* opinion suggests that the plaintiffs might obtain judgments against any entity that was responsible for the injury, and that the Price Anderson Act makes the licensee an indemnitor. If this is a correct reading of Price Anderson, the *Hall* plaintiffs in the underlying federal action may obtain judgments against ARCO.

The case law is in its infancy. Thus, B&W may, in good faith, argue that ANI's interpretation of Price Anderson is not correct.

Furthermore, each of the cases which ANI cited addresses only claims occurring during the time in which the licensee held the license. The present case involves claims made against a prior licensee and a current licensee. In addition, in the cases which ANI cited, the courts never addressed any contribution issues between licensees or contribution issues based on indemnity agreements.

For some plaintiffs in the underlying *Hall* action, as of the date on which cancer was diagnosed, B&W had never been a licensee, had never been an operator and had no responsibility for the facility. If Price Anderson channels liability to the licensee, it is unclear why liability would not be channeled to the entity that held the license during the relevant time rather than to a current licensee that had nothing to do with the operation of the facility at the time the plaintiff was diagnosed with cancer.

Plaintiffs' claims against B&W and ARCO include claims for punitive damages. If the outrageous conduct of ARCO caused cancer that was diagnosed before B&W became the licensee, it is not clear why liability would not be channeled to ARCO rather than to the entity that held the license at the time the lawsuit was filed.

Also, even assuming that Price Anderson channels liability to licensees, if discharges occurred over a period of time in which two or more entities were the licensees, it is not clear why an interpretation of Price Anderson permitting a jury to find that more than one licensee was responsible for the plaintiffs' injuries, would not best serve the purposes of Price Anderson of

making money available to victims of nuclear discharges.

The final issue is whether B&W and ARCO waived their right to be represented by different counsel because of their willingness to be represented by the same law firm during the initial litigation. There can be no waiver because of the developments that occurred beginning with the jury verdict in the underlying *Hall* litigation. The jury verdict established that the claims are substantial, that the court was using a verdict slip that required separate findings as to the plaintiffs' claims against B&W and ARCO, that the activities of both defendants may have caused many of the plaintiffs' injuries, and that B&W and ARCO have conflicting interests unless there is sufficient insurance that will cover all of the claims. Shortly thereafter, ANI raised arguments concerning the application of its insurance policies which suggested that insurance coverage may be inadequate.

Furthermore, as long as the plaintiffs are raising claims against both B&W and ARCO and the trial court may be using verdict forms which require the jury to make separate findings as to the responsibilities of B&W and ARCO for the plaintiffs' injuries, it is not possible for a single law firm to represent B&W and ARCO. Rule 1.7 of the Rules of Professional Conduct does not permit a lawyer to represent a client if the representation of that client will be directly adverse to another client unless the lawyer reasonably believes that the representation will not adversely affect the relationship with the other client. In the present posture of the underlying litigation, a lawyer cannot reasonably believe that he or she can represent both clients.

## POST SCRIPT

In parts I and II of this opinion, I have assumed that judgments may be entered against one or more of the defendants in the underlying *Hall* litigation and that payment of these judgments may be sought from these defendants. See footnote 12 of this opinion, *supra* at 376, where I state that ANI does not contend that Price Anderson limits the plaintiffs' recovery against a licensee to that amount of insurance coverage plus other financial protections provided for under the Price Anderson Act, and in which I state that ANI does not contend that B&W could not in separate proceedings seek to recover from ARCO payments made to the plaintiffs.

However, elsewhere in its brief in support of motion for summary judgment at 7, ANI describes the Price Anderson Act as follows:

"The 1975 amendment put in place three levels of financial protection to respond in the event of a nuclear incident. The first layer, called primary financial protection, consists of private insurance, which the NRC requires licensees to purchase in the maximum amount available from insurers. The second layer, called secondary financial protection, was added by the 1975 amendment and consists of a retrospective premium program. In the event of a nuclear incident resulting in public liability exceeding the layer of primary financial protection, the secondary financial protection program requires each NRC licensee to contribute a certain amount (originally between $2 million and $5 million) to meet the cost of the remaining public liability. If the public liability for a nuclear incident exceeded both the primary and secondary layers of financial protection,

the federal government would pay to compensate victims for the difference between the two layers and the cap on aggregate public liability.

"Today, following a further amendment of the Price Anderson Act in 1988 in which Congress eliminated the third layer of federally-funded financial protection, the Act provides that the public liability of a licensee for a nuclear incident shall be capped at the amount of financial protection available under the primary and secondary layers. See 42 U.S.C. §2210(e)(1). In the event that public liability for any nuclear incident exceeds those amounts, Congress will review the incident and take any further action it deems necessary to compensate victims. *Id.* at §2210(e)(2)."

If Price Anderson should be construed to cap the liability of a licensee at the amount of financial protection available under the primary and secondary layers of financial protection, the ANI insurance policies for the mandated insurance should not be narrowly construed in the manner which ANI proposes.[20] In this ANI brief at 8, ANI recognizes that one of the goals of the Price Anderson Act is to provide adequate compensation to persons injured by exposure to nuclear material. Since the ANI policies were designed to furnish coverage in the context of the Price Anderson Act, they must be construed to provide adequate compensation for victims of nuclear incidents.

Also, if the liability of a licensee is capped at the amount of the financial protection afforded under the primary and secondary layers, ANI would be treating both B&W and ARCO as nominal defendants. However, ANI is not treating these defendants in this fashion be-

---

20. No party has based its motion for partial summary judgment on this construction of Price Anderson.

cause, if it was ANI's position that the liability of B&W and ARCO is capped at whatever insurance is available, ANI would not be raising insurance coverage issues against B&W and ARCO. In this situation, B&W and ARCO would not be proper parties to sue because they would not be concerned with the amount of insurance that is available to the plaintiffs in the underlying *Hall* case.

If it was ANI's position that B&W and ARCO are only nominal defendants (and, thus, ANI is the only party that has a financial interest in the outcome of the underlying *Hall* litigation), ANI should have retained one law firm acting under ANI's direction whose sole mission is to minimize recovery in the underlying *Hall* litigation, and a separate law firm (or law firms) which raises the legal position on behalf of B&W and ARCO that they are only nominal defendants.

## ORDER

On April 25, 2001, upon consideration of the motions for partial summary judgment filed by Babcock & Wilcox Company, Atlantic Richfield Company, and American Nuclear Insurers, it is hereby ordered, adjudged, and decreed that:

(1) with respect to the ANI facility form policy nos. NF-39, NF-83, MF-83 and MF-84, the date of manifestation is an applicable trigger;

(2) ANI has a duty to pay for independent defense counsel to represent and defend the separate interests of B&W and ARCO in the *Hall* action; and

(3) a status conference will be held on May 21, 2001 at 11 a.m. o'clock.